## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK



J. ROBERT ORTON, JR., Derivatively On Behalf of MBIA INC.

    Plaintiff,

vs.

JOSEPH (JAY) W. BROWN, GARY C. DUNTON, NEIL G. BUDNICK, NICHOLAS FERRERI, DOUGLAS C. HAMILTON, JULLIETTE S. TEHRANI, RICHARD L. WEILL, DAVID H. ELLIOTT, CLAIRE L. GAUDIANI, DANIEL P. KEARNEY, DAVID C. CLAPP, JOHN A. ROLLS, C. EDWARD CHAPLIN, DEBRA J. PERRY, LAURENCE MEYER, JEFFERY W. YABUKI, PIERRE-HENRI RICHARD, WILLIAM H. GRAY, III, FREDA S. JOHNSON AND JAMES A. LEBENTHAL,

    Defendants,

  - and -

MBIA INC., a Connecticut corporation,

    Nominal Defendant.

Civil Action No.

06 CV 3146



DEMAND FOR JURY TRIAL

### VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, ABUSE OF CONTROL, GROSS MISMANAGEMENT, WASTE OF CORPORATE ASSETS, UNJUST ENRICHMENT AND VIOLATIONS OF THE SARBANES-OXLEY ACT OF 2002

Plaintiff, by his attorneys, submits this Verified Shareholder Derivative Complaint (the "Complaint") against the defendants named herein.

### NATURE OF THE ACTION

1.    This is a shareholder derivative action brought by a shareholder of MBIA Inc. ("MBIA" or the "Company"), on behalf of the Company against certain of its officers and directors seeking to remedy defendants' violations of state and federal law, including breaches of fiduciary duties, abuse of control, gross mismanagement, waste of corporate assets, unjust enrichment and violations of the Sarbanes-Oxley Act of 2002 that occurred between January 1998 and the present

1

(the "Relevant Period") and that have caused substantial losses to MBIA and other damages, such as to its reputation and goodwill.

## JURISDICTION AND VENUE

2.      This Court has jurisdiction over all claims asserted herein pursuant to 28 U.S.C. §1331 in that plaintiff's claims arise in part under the Constitution and laws of the United States, including the Sarbanes-Oxley Act of 2002. This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

3.      This Court also has jurisdiction over all claims asserted herein pursuant to 28 U.S.C. §1332(a)(2), because complete diversity exists between the plaintiff and each defendant, and the amount in controversy exceeds $75,000. This Court also has supplemental jurisdiction pursuant to 28 U.S.C. §1367(a).

4.      This Court retains general jurisdiction over each named defendant who is a resident of New York. Additionally, this Court has specific jurisdiction over each named non-resident defendant because these defendants maintain sufficient minimum contacts with New York to render jurisdiction by this Court permissible under traditional notions of fair play and substantial justice. MBIA maintains operations in New York and is traded on the New York Stock Exchange, and because the allegations contained herein are brought derivatively on behalf of MBIA, defendants' conduct was purposefully directed at New York. Defendants' conduct arose out of New York, where MBIA maintains its corporate headquarters. Finally, exercising jurisdiction over the named non-resident defendants is reasonable.

5.      Venue is proper in this Court pursuant to 28 U.S.C. §1391(a) because one or more of the defendants either resides in or maintains executive offices in this District, a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein and aiding and abetting and conspiracy in violation of fiduciary duties owed to MBIA occurred in this District, and defendants have received substantial

2

compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## SUMMARY OF THE ACTION

6.      MBIA is a financial guarantee company and provider of investment management products and services.  Through its subsidiaries, the Company provides financial guarantees to help public-and private-sector entities to obtain access to capital.   The Company also guarantees municipal bonds, infrastructure finance issues, structured asset-backed and mortgage-backed transactions in both the new issue and secondary markets -- internationally as well as domestically.

7.      During the Relevant Period, defendants caused or allowed the Company to make materially false and misleading statements regarding the Company's business and prospects.

8.      Then, on March 8, 2005, the defendants caused or allowed the Company to issue a press release entitled "MBIA to Restate Financial Statements for 1998 and Subsequent Years." The press release stated in relevant part:

> MBIA Inc. announced today that it has decided to restate its financial statements for 1998 and subsequent years. The restatement is being made to correct the accounting treatment for two reinsurance agreements that MBIA entered into in 1998 with Converium Re (previously known as Zurich Reinsurance North America). The restatement will not have a material effect on MBIA's financial position, and MBIA does not expect the restatement to have any effect on its ratings or on the Triple-A ratings of MBIA Insurance Corporation.
>
> As a result of this restatement, MBIA's financial results for 1998 will reflect a third quarter incurred loss of $70 million related to $265 million of bonds insured by MBIA that were issued by Allegheny Health, Education and Research Foundation (AHERF). The after-tax loss will be approximately $47 million, resulting in net income for the year of approximately $386 million, or $2.57 per share, down 11% from $433 million or $2.88 per share as originally reported.
>
> MBIA estimates that its earnings will be reduced by approximately $6 million (or four cents per share) in 1999, $4 million (or 3 cents per share) in 2000, $3 million (or two cents per share) in 2001 and will have a de minimis effect in 2002. MBIA estimates that its earnings will increase by approximately $2 million (or one cent per share) in 2003 and $4 million (or three cents per share) in 2004. The Company expects to finalize these estimates and file its 2004 audited financial statements in its 10K by the March 16 deadline. The restatement could result in a delay in this filing.

9.      The true facts, which were known or should have been known by each of the defendants but concealed from the investing public during the Relevant Period, were as follows:

3

(a)     that MBIA was materially overstating its financial results by engaging in improper accounting practices. As detailed herein, MBIA has admitted that its prior financial reports are materially false and misleading and has restated its results for 1998 and subsequent years. The defendants have caused or allowed the Company to restate six years of financials to reflect that it improperly accounted for two reinsurance agreements and to admit the Company has been subpoenaed by the Securities and Exchange Commission ("SEC"), the New York Attorney General's Office and U.S. Attorney's Office for the Southern District of New York concerning documents relating to the accounting treatment of advisory fees, its methodology for determining loss reserves and case reserves, and instances of purchase of credit default protection on itself, among other things;

(b)     that the Company lacked adequate internal controls and was therefore unable to ascertain its true financial condition; and

(c)     that as a result of the foregoing, the values of the Company's earnings and net income was materially overstated at all relevant times.

10.     As a result of the defendants' false statements, MBIA's stock price traded at inflated levels during the Relevant Period, increasing to as high as $65.43 per share. However, after the truth began to be revealed in MBIA's press release on March 8, 2005, the Company's shares fell to below $ 58.43 per share.

## THE PARTIES

11.     Plaintiff J. Robert Orton, Jr. is, and was at times relevant hereto, an owner and holder of MBIA common stock. Plaintiff is a citizen of California.

12.     Nominal defendant MBIA is a corporation organized and existing under the laws of the state of Connecticut with its headquarters located at 113 King Street, Armonk, New York 10504. Nominal defendant MBIA is engaged in providing financial guarantee insurance, investment management services, and municipal and other services to public finance, and structured finance clients on a global basis. The Company conducts its financial guarantee business through its wholly owned subsidiary, MBIA Insurance Corporation.

4

13.     Defendant Joseph (Jay) W. Brown ("Brown") is, and at all relevant times hereto was, Chief Executive Officer ("CEO") from January 1999 until May 2004. Defendant Brown has also served as Chairman of the Board of Directors of MBIA (the "Board") since May 1999, as Executive Chairman since May 2004 and has been a director since 1990. Because of Brown's positions, he knew the adverse non-public information about the business of MBIA, as well as its finances, markets and present and future business prospects via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board and management meetings and committees thereof and via reports and other information provided to him in connection therewith. During the Relevant Period, Brown participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. During the Relevant Period, MBIA paid defendant Brown the following compensation:

| Fiscal Year | Salary | Bonus | Other Compensation | Restricted Stock Awards | LTIP | Stock Options |
|---|---|---|---|---|---|---|
| 2005 | $547,500 | $1,728,000 | $380,952 | $0 | $0 | 0 |
| 2004 | $779,769 | $1,512,000 | $416,965 | $0 | $0 | 0 |
| 2003 | $750,000 | $2,000,000 | $1,366,866 | $3,020,855 | $0 | 304,000 |
| 2002 | $750,000 | $0 | $421,036 | $1,600,000 | $1,685,000 | 375,000 |
| 2001 | $750,000 | $0 | $395,486 | $1,373,111 | $0 | 375,000 |
| 2000 | $750,000 | $0 | $395,507 | $0 | $0 | 1,446,000 |
| 1999 | $738,942 | $0 | $329,440 | $0 | $0 | 964,000 |
| 1998 | $0 | $0 | $0 | $0 | $0 | 0 |

Defendant Brown is a citizen of New York.

14.     Defendant Gary C. Dunton ("Dunton") is, and at all relevant times hereto was, President of MBIA since January 1999, CEO since May 2004 and a director of MBIA since 1996. Because of Dunton's positions, he knew the adverse non-public information about the business of MBIA, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board and management meetings and committees thereof and via reports and other information provided to him in connection therewith. During the Relevant Period, Dunton participated in the issuance of false and/or misleading statements, including the preparation of the

5

false and/or misleading press releases and SEC filings.  During the Relevant Period, MBIA paid defendant Dunton the following compensation:

| Fiscal Year | Salary | Bonus | Other Compensation | Restricted Stock Awards | LTIP | Stock Options |
|---|---|---|---|---|---|---|
| 2005 | $825,000 | $1,650,000 | $335,738 | $0 | $2,200,000 | 200,000 |
| 2004 | $779,247 | $0 | $344,403 | $1,925,000 | $1,863,445 | 200,000 |
| 2003 | $700,000 | $0 | $744,392 | $2,000,000 | $1,965,600 | 200,000 |
| 2002 | $600,000 | $0 | $246,715 | $1,300,000 | $1,000,000 | 200,000 |
| 2001 | $600,000 | $0 | $309,308 | $1,500,000 | $600,000 | 112,500 |
| 2000 | $600,000 | $0 | $207,574 | $1,373,077 | $0 | 75,000 |
| 1999 | $568,750 | $0 | $241,464 | $960,000 | $0 | 273,770 |
| 1998 | $462,000 | $300,000 | $207,574 | $683,342 | $0 | 66,000 |

Defendant Dunton is a citizen of Connecticut.

15.     Defendant Neil G. Budnick ("Budnick") is, and at all relevant times hereto was, Chief Financial Officer ("CFO") and Vice President of MBIA until May 2004.  Defendant Budnick has served as President of MBIA Insurance Corporation since May 2004.  Because of Budnick's positions, he knew the adverse non-public information about the business of MBIA, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings and via reports and other information provided to him in connection therewith.  During the Relevant Period, Budnick participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings.  During the Relevant Period, MBIA paid defendant Budnick the following compensation:

| Fiscal Year | Salary | Bonus | Other Compensation | Restricted Stock Awards | LTIP | Stock Options |
|---|---|---|---|---|---|---|
| 2005 | $600,000 | $960,000 | $273,946 | $0 | $1,125,000 | 100,000 |
| 2004 | $589,455 | $0 | $307,758 | $1,200,000 | $1,043,530 | 55,000 |
| 2003 | $575,000 | $500,000 | $587,794 | $550,000 | $1,103,602 | 55,000 |
| 2002 | $525,000 | $295,000 | $200,989 | $590,000 | $527,850 | 75,000 |
| 2001 | $525,000 | $330,000 | $240,163 | $675,000 | $309,558 | 54,000 |
| 2000 | $525,000 | $300,000 | $229,308 | $617,885 | $0 | 0 |
| 1999 | $512,500 | $220,500 | $194,316 | $441,000 | $230,721 | 191,420 |
| 1998 | $350,000 | $250,000 | $135,171 | $166,642 | $0 | 12,780 |

6

During the Relevant Period, Budnick sold 26,500 shares of MBIA stock for proceeds of $1,423,291. Defendant Budnick is a citizen of Connecticut.

16.     Defendant Nicholas Ferreri ("Ferreri") is, and at relevant times hereto was, CFO of MBIA since May 2004. Because of Ferreri's position, he knew the adverse non-public information about the business of MBIA, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings and via reports and other information provided to him in connection therewith. During the Relevant Period, Ferreri participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. Defendant Fererri is a citizen of New Jersey.

17.     Defendant Douglas C. Hamilton ("Hamilton") is, and was at all times relevant hereto, Assistant Vice President and Controller of MBIA. Because of Hamilton's positions, he knew the adverse non-public information about the business of MBIA, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings and via reports and other information provided to him in connection therewith. During the Relevant Period, Hamilton participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. Defendant Hamilton is a citizen of New York.

18.     Defendant Julliette S. Tehrani ("Tehrani") was, at relevant times hereto, CFO and Executive Vice President of MBIA until September 1998. Because of Tehrani's positions, she knew the adverse non-public information about the business of MBIA, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings and via reports and other information provided to her in connection therewith. During the Relevant Period, Tehrani participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. During the Relevant

7

Period, Tehrani sold 40,683 shares of MBIA stock for proceeds of $2,780,502. Defendant Tehrani is a citizen of Connecticut.

19.     Defendant Richard L. Weill ("Weill") was, at relevant times hereto, Vice Chairman of MBIA from April 1999 until June 2004. Defendant Weill was also a director of MBIA from 1990 until March 2000. Because of Weill's positions, he knew the adverse non-public information about the business of MBIA, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board and management meetings and committees thereof and via reports and other information provided to him in connection therewith. During the Relevant Period, Weill participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. During the Relevant Period, MBIA paid defendant Weill the following compensation:

| Fiscal Year | Salary | Bonus | Other Compensation | Restricted Stock Awards | LTIP | Stock Options |
|---|---|---|---|---|---|---|
| 2004 | $262,500 | $750,000 | $67,823 | $0 | $2,951,743 | 0 |
| 2003 | $525,000 | $900,000 | $859,876 | $1,000,000 | $1,103,602 | 55,000 |
| 2002 | $525,000 | $295,000 | $206,071 | $956,900 | $561,850 | $55,000 |
| 2001 | $525,000 | $330,000 | $270,121 | $675,000 | $488,775 | $54,000 |
| 2000 | $525,000 | $300,000 | $259,286 | $617,885 | $0 | $36,000 |
| 1999 | $531,200 | $0 | $225,737 | $735,000 | $469,087 | $41,420 |
| 1998 | $500,000 | $400,000 | $243,742 | $366,690 | $0 | $13,600 |

During the Relevant Period, Weill sold 251,550 shares of MBIA stock for proceeds of $14,741,642.50. Defendant Weill is a citizen of Arizona.

20.     Defendant David H. Elliott ("Elliott") was, at relevant times hereto, Chairman of MBIA until May 1999 and CEO of MBIA until January 1999. Defendant Elliott was a director of MBIA until May 2002. Because of Elliott's positions, he knew the adverse non-public information about the business of MBIA as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board and management meetings and committees thereof and via reports and other information provided to him in connection therewith. During the

8

Relevant Period, Elliott participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. During the Relevan Period, MBIA paid to defendant Elliott the following compensation:

| Fiscal Year | Salary | Bonus | Other Compensation | Restricted Stock Awards | LTIP | Stock Options |
|---|---|---|---|---|---|---|
| 1999 | $262,500 | $0 | $1,879,073 | $0 | $749,749 | $0 |
| 1998 | $600,000 | $750,000 | $369,391 | $666,697 | $0 | $160,000 |

During the Relevant Period, Elliott sold 222,748 shares of MBIA stock for proceeds of $13,846,058.68. Defendant Elliott is a citizen of New York.

21.    Defendant Claire L. Gaudiani ("Gaudiani") is, and at all times relevant hereto was, a director of MBIA since 1992. Because of Gaudiani's position, she knew the adverse non-public information about the business of MBIA, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to her in connection therewith. During the Relevant Period, Gaudiani participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. Defendant Gaudiani is a citizen of Connecticut.

22.    Defendant Daniel P. Kearney ("Kearney") is, and at all times relevant hereto was, a director of MBIA since 1992. Because of Kearney's position, he knew the adverse non-public information about the business of MBIA, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith. During the Relevant Period, Kearney participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. Defendant Kearney is a citizen of Massachusetts.

9

23.     Defendant David C. Clapp ("Clapp") is, and at all times relevant hereto was, a director of MBIA since 1994.  Because of Clapp's position, he knew the adverse non-public information about the business of MBIA, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith.  During the Relevant Period, Clapp participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings.  Defendant Clapp is a citizen of New York.

24.     Defendant John A. Rolls ("Rolls") is, and at all times relevant hereto was, a director of MBIA since 1995.  Because of Rolls' position, he knew the adverse non-public information about the business of MBIA, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith.  During the Relevant Period, Rolls participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings.  Defendant Rolls is a citizen of New York.

25.     Defendant C. Edward Chaplin ("Chaplin") is, and at times relevant hereto was, a director of MBIA since 2002.  Because of Chaplin's position, he knew the adverse non-public information about the business of MBIA, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith.  During the Relevant Period, Chaplin participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings.  Defendant Chaplin is a citizen of New Jersey.

26.     Defendant Debra J. Perry ("Perry") is, and at times relevant hereto was, a director of MBIA since March 2004. Because of Perry's position, she knew the adverse non-public information about the business of MBIA, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to her in connection therewith. During the Relevant Period, Perry participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. Defendant Perry is a citizen of New Jersey.

27.     Defendant Laurence Meyer ("Meyer") is, and at times relevant hereto was, a director of MBIA a since August 2004. Because of Meyer's position, he knew the adverse non-public information about the business of MBIA, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith. During the Relevant Period, Meyer participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. Defendant Meyer is a citizen of Delaware.

28.     Defendant Jeffery W. Yabuki ("Yabuki") is, and at times relevant hereto was, a director of MBIA since August 2005. Because of Yabuki's position, he knew the adverse non-public information about the business of MBIA, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith. During the Relevant Period, Yabuki participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. Defendant Yabuki is a citizen of Kansas.

11

29.     Defendant Pierre-Henri Richard ("Richard") was, at times relevant hereto, a director of MBIA until March 2000.  Because of Richard's position, he knew the adverse non-public information about the business of MBIA, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith.  During the Relevant Period, Richard participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings.  Defendant Richard is a citizen of France.

30.     Defendant William H. Gray, III ("Gray") was, at times relevant hereto, a director of MBIA until December 2002.  Because of Gray's position, he knew the adverse non-public information about the business of MBIA, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith.  During the Relevant Period, Gray participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings.  Defendant Gray is a citizen of Pennsylvania.

31.     Defendant Freda S. Johnson ("Johnson") was, at times relevant hereto, a director of MBIA until December 2004.  Because of Johnson's position, she knew the adverse non-public information about the business of MBIA, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to her in connection therewith.  During the Relevant Period, Johnson participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings.  Defendant Johnson is a citizen of New York.

32.     Defendant James A. Lebenthal ("Lebenthal") was, at times relevant hereto, a director of MBIA until December 2004. Because of Lebenthal's position, he knew the adverse non-public information about the business of MBIA, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith. During the Relevant Period, Lebenthal participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. Defendant Lebenthal is a citizen of New York.

33.     The defendants identified in ¶¶13-14, 19-32 are referred to herein as the "Director Defendants." The defendants identified in ¶¶13-20 are referred to herein as the "Officer Defendants." The defendants identified in ¶¶15, 18-20 are referred to herein as the "Insider Selling Defendants." Collectively, the Director Defendants, the Officer Defendants and the Insider Selling Defendants are referred to herein as the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

34.     By reason of their positions as officers, directors and/or fiduciaries of MBIA and because of their ability to control the business and corporate affairs of MBIA, the Individual Defendants owed MBIA and its shareholders fiduciary obligations of trust, loyalty, good faith and due care, and were and are required to use their utmost ability to control and manage MBIA in a fair, just, honest and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of MBIA and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

35.     Each director and officer of the Company owes to MBIA and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing. In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard to the

13

Company's revenue, margins, operations, performance, management, projections and forecasts so that the market price of the Company's stock would be based on truthful and accurate information.

36.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of MBIA, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company. Because of their advisory, executive, managerial and directorial positions with MBIA, each of the Individual Defendants had access to adverse non public information about the financial condition, operations, and improper representations of MBIA.

37.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of MBIA, and was at all times acting within the course and scope of such agency.

38.     To discharge their duties, the officers and directors of MBIA were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the financial affairs of the Company. By virtue of such duties, the officers and directors of MBIA were required to, among other things:

(a)     refrain from acting upon material inside corporate information to benefit themselves;

(b)     ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

(c)     conduct the affairs of the Company in an efficient, business like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(d)     properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results and prospects, and ensuring that the Company maintained an adequate

14

system of financial controls such that the Company's financial reporting would be true and accurate at all times;

(e)     remain informed as to how MBIA conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices and make such disclosures as necessary to comply with federal and state securities laws; and

(f)     ensure that the Company was operated in a diligent, honest and prudent manner in compliance with all applicable federal, state and local laws, rules and regulations.

39.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of MBIA, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and/or directors of the Company during the Relevant Period has been ratified by the remaining Individual Defendants who collectively comprised all of MBIA's Board during the Relevant Period.

40.     The Individual Defendants breached their duties of loyalty and good faith by allowing defendants to cause or by themselves causing the Company to misrepresent its financial results and prospects, as detailed herein *infra*, and by failing to prevent the Individual Defendants from taking such illegal actions. In addition, as a result of the Individual Defendants' illegal actions and course of conduct during the Relevant Period, the Company is now the subject of several class action law suits that allege violations of federal securities laws. As a result, MBIA has expended and will continue to expend significant sums of money. Such expenditures include, but are not limited to:

15

(a)    Costs incurred to carry out internal investigations, including legal fees paid to outside counsel; and

(b)    Costs incurred in investigating and defending MBIA and certain officers in the class actions, plus potentially millions of dollars in settlements or to satisfy an adverse judgment.

41.    Moreover, these actions have irreparably damaged MBIA's corporate image and goodwill. For at least the foreseeable future, MBIA will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that MBIA's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

42.    In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design. In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breach of their respective duties.

43.    During all times relevant hereto, the Individual Defendants collectively and individually initiated a course of conduct that was designed to and did: (i) conceal the fact that the Company was improperly misrepresenting its financial results, in order to allow defendants to artificially inflate the price of the Company's shares; (ii) maintain the Individual Defendants' executive and directorial positions at MBIA and the profits, power and prestige that the Individual Defendants enjoyed as a result of these positions; and (iii) deceive the investing public, including shareholders of MBIA, regarding the Individual Defendants' management of MBIA's operations, the Company's financial health and stability, and future business prospects, specifically related to the Company's financials that had been misrepresented by defendants throughout the Relevant Period. In furtherance of this plan, conspiracy and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein.

16

44.     The Individual Defendants engaged in a conspiracy, common enterprise and/or common course of conduct commencing by at least January 1998 and continuing thereafter. During this time the Individual Defendants caused the Company to conceal the true fact that MBIA was misrepresenting its financial results. In addition, the Individual Defendants also made other specific, false statements about MBIA's financial performance and future business prospects, as alleged herein.

45.     The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise the Individual Defendants' violations of law, breaches of fiduciary duty, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment; to conceal adverse information concerning the Company's operations, financial condition and future business prospects; and to artificially inflate the price of MBIA common stock so they could: (i) dispose of over $32 million of their personally held stock; (ii) protect and enhance their executive and directorial positions and the substantial compensation and prestige they obtained as a result thereof; and (iii) enable the Company to complete and offering of $350 million aggregate principal amount of senior notes.

46.     The Individual Defendants accomplished their conspiracy, common enterprise and/or common course of conduct by causing the Company to purposefully, recklessly or negligently misrepresent its financial results. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary and substantial participant in the conspiracy, common enterprise and/or common course of conduct complained of herein.

47.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

17

## IMPROPER STATEMENTS

48. The Individual Defendants by their fiduciary duties of care, good faith and loyalty owed to MBIA a duty to insure that the Company's financial reporting fairly presented, in all material respects, the operations and financial condition of the Company. In order to adequately carry out these duties, it is necessary for the Individual Defendants to know and understand the material non-public information to be either disclosed or omitted from the Company's public statements. This material non-public information included MBIA's accounting practices. From FY:98 to FY:02, defendants Gray, Lebenthal, Johnson and Rolls served as a members of the Audit Committee. For FY:03, defendants Johnson, Chaplin, Lebenthal and Rolls served as a members of the Audit Committee. For FY:04, defendants Johnson, Perry, Chaplin, Lebenthal and Rolls served as a members of the Audit Committee. For FY:05, defendants Perry, Clapp, Chaplin, Rolls and Yabuki served as a members of the Audit Committee. The current members of the Audit Committee are defendants Perry, Clapp, Chaplin, Rolls and Yabuki. Furthermore, these defendants as members of the Audit Committee had a special duty to know and understand this material information as set out in the Audit Committee's charter which provides that the Audit Committee is responsible for discussing the Company's earnings press releases; as well as financial information and earnings guidance provided to analysts and rating agencies. Brown, Dunton, Budnick, Ferreri, Hamilton, Weill, Tehrani and Elliott as officers of MBIA, had ample opportunity to discuss this material information with their fellow officers at management meetings and via internal corporate documents and reports. Moreover, defendants Brown, Dunton, Chaplin, Clapp, Gaudiani, Kearney, Meyer, Perry, Rolls, Yabuki, Richard, Gray, Johnson and Lebenthal as directors of MBIA had ample opportunity to discuss this material information with management and fellow directors at any of the forty-seven Board meetings that occurred during the Relevant Period as well as at meetings of Committees of the Board. Despite these duties, the Individual Defendants negligently, recklessly, and/or intentionally caused or allowed, by their actions or inactions, the following improper statements to be disseminated by MBIA to the investing public and the Company's shareholders during the Relevant Period.

18

49.    On May 5, 1998, the Individual Defendants caused or allowed the Company to issue a

press release entitled "MBIA Inc. Reports 23 Percent Increase in 1998 First Quarter Net Income

Excluding $19.2 Million After-Tax Charge as a Result of CapMAC Merger." The press release

stated in relevant part:

> MBIA Inc., the holding company for MBIA Insurance Corporation, today reported
> that 1998 first quarter net income rose 23 percent to $119.4 million, excluding a
> $19.2 million after-tax charge for CapMAC merger-related expenses, from $96.9
> million in the first quarter of 1997. Including the merger-related charge, first quarter
> net income increased 4 percent to $100.3 million.

* * *

> David H. Elliott, chairman and chief executive officer, said, "MBIA reported
> strong financial and operating results in the first quarter. We are particularly pleased
> that the integration of CapMAC is proceeding smoothly and has enhanced our
> competitive position in the growing global structured finance market. Looking ahead,
> we are well positioned to capitalize on dynamic growth prospects in our financial
> guarantee insurance markets and to continue the expansion of our financial services
> activities."

50.    On August 4, 1998, the Individual Defendants caused or allowed the Company to

issue a press release entitled "MBIA Inc. Second Quarter Net Income Increases 20 Percent." The

press release stated in relevant part:

> MBIA Inc. the holding company for MBIA Insurance Corporation reported today
> that 1998 second quarter net income rose 20 percent to $116.2 million from $96.5
> million in the same period last year. Diluted earnings per share increased 16 percent
> to $1.17 from $1.01. Diluted operating earnings per share were $1.13 in the second
> quarter, up 14 percent from $0.99.

* * *

> David H. Elliott, chairman and chief executive officer, said, "We are very
> pleased with our solid financial results in the second quarter. MBIA's insurance
> operations recorded strong gains as demand for our guarantee remained robust in the
> municipal, structured finance and international markets. In addition, the completion
> of the merger with 1838 Investment Advisors significantly enhances our investment
> management capabilities by enabling us to offer our clients a full line of investment
> products and services. Looking ahead, MBIA's growth prospects continue to be very
> favorable."
>
> Regarding MBIA's $256 million of net par exposure to a Philadelphia
> hospital group which filed for bankruptcy, Mr. Elliott said, "*MBIA expects that its
> unallocated loss reserve will be adequate to handle losses arising from the
> bankruptcy filing of the Delaware Valley Obligated Group. Bankruptcy situations
> such as this demonstrate the value of our guarantee to bondholders and typically
> have stimulated demand for insured securities.*"

19

51. MBIA's financial results for the second quarter of 1998, the period ending June 30,

1998, were repeated in the Company's Form 10-Q filed with the SEC on August 14, 1998, which

was signed by defendant Tehrani.

52. On September 29, 1998, the Individual Defendants caused or allowed the Company to

issue a press release entitled "MBIA Announces Exposure to Bankrupt Pennsylvania Hospital Group

to be Covered by Reinsurance Agreements; Expects No Impact on Earnings." The press release

stated in relevant part:

MBIA Inc. announced today that it has obtained $170 million of reinsurance that it
expects will cover anticipated losses arising from the bankruptcy of the Delaware
Valley Obligated Group (DVOG). As a result, the company does not expect exposure
to this insured credit to affect its earnings or reduce its unallocated loss reserve.

MBIA has insured $256 million of the net par outstanding of DVOG, an
entity comprising five hospitals and a medical university in the Philadelphia area that
is part of Pittsburgh-based Allegheny Health, Education and Research Foundation
(AHERF). AHERF filed for bankruptcy reorganization for portions of its system,
including DVOG, in July 1998.

"As part of our risk management efforts, the company has entered into
strategic business relationships with highly rated reinsurers to provide them with
future business as part of the reinsurance agreement. *The cost of these reinsurance
arrangements over the next few years will have a minimal impact on earnings
while strengthening our claims-paying resources and risk management
capabilities,*" said Richard L. Weill, MBIA vice chairman.

53. On November 3, 1998, the Individual Defendants caused or allowed the Company to

issue a press release entitled "MBIA Inc. Reports 17 Percent Increase in Third Quarter Net Income,

Excluding $16.9 Million After-Tax Charge for Merger-Related Expenses." The press release stated

in relevant part:

MBIA Inc., holding company for MBIA Insurance Corporation, reported today that
third quarter net income increased 17 percent to $125.1 million, excluding a $16.9
million after-tax charge for merger-related expenses for 1838 Investment Advisors,
the remaining costs of other merger-related activities and reorganization expenses to
streamline operations and reduce future operating costs.

Including the charge, third quarter net income increased 2 percent to $108.2
million from $106.6 million in last year's third quarter.

* * *

Regarding MBIA's exposure to a Philadelphia hospital group which filed for
bankruptcy, MBIA expects that any anticipated losses arising from the Delaware

20

Valley Obligated Group (DVOG) will be fully covered by reinsurance. As a result,
the company's third quarter earnings have not been affected by the bankruptcy.

54.     MBIA's financial results for the third quarter of 1998, the period ending September

31, 1998, were repeated in the Company's Form 10-Q filed with the SEC on November 16, 1998,

which was signed by defendant Tehrani.

55.     On February 2, 1999, the Individual Defendants caused or allowed the Company to

issue a press release entitled "MBIA Inc. Reports 13 Percent Increase in Fourth Quarter Net Income,

Excluding One-Time After-Tax Charge of $12.8 Million Related to the Reorganization of Its

Municipal Services Operations." The press release stated in relevant part:

> MBIA Inc., holding company for MBIA Insurance Corporation, reported today that
> fourth quarter net income increased 13 percent to $116.2 million, excluding a $12.8
> million after-tax charge primarily comprising a write-off of goodwill from the
> reorganization of its municipal services operations. Including the charge, fourth
> quarter net income increased 1 percent to $103.4 million from $102.4 million in
> 1997's fourth quarter.

56.     MBIA's financial results for the fourth quarter of 1998, the period ending December

31, 1998, were repeated in the Company's Form 10-K filed with the SEC on March 30, 1999, which

was signed by defendants Clapp, Gaudiani, Lebenthal, Rolls, Johnson, Kearney, Gray, Richard and

Tehrani.

57.     On May 4, 1999, the Individual Defendants caused or allowed the Company to issue a

press release entitled "MBIA Inc. Reports 2 Percent Increase in First Quarter Net Income, Excluding

One-time Charges." The press release stated in relevant part:

> MBIA Inc. the holding company for MBIA Insurance Corporation, today reported
> that first quarter net income, excluding one-time charges, rose 2 percent to $123.9
> million from $121.3 million. In the first quarter of 1999, the company took an after-
> tax charge of $114.5 million for increasing its unallocated loss reserve. In the same
> period last year, the company recorded an after-tax charge of $19.2 million related to
> CapMAC merger expenses. Including the one-time charges, first quarter net income
> decreased 91 percent to $9.4 million.

58.     MBIA's financial results for the first quarter of 1999, the period ending March 31,

1999, were repeated in the Company's Form 10-Q filed with the SEC on May 14, 1999, which was

signed by defendant Budnick.

59.    On August 3, 1999, the Individual Defendants caused or allowed the Company to

issue a press release entitled "MBIA Inc. Second Quarter Earnings Increase 2 Percent, Excluding

One-Time Charge Related to Write-Down of Investment in Capital Asset; Board of Directors

Authorizes Common Stock Buyback of Up to 7.5 Million Shares." The press release stated in

relevant part:

> MBIA Inc., the holding company for MBIA Insurance Corporation, reported today
> that second quarter net income rose 2 percent to $121.8 million from $119.0 million
> in the second quarter of last year, excluding a $65.0 million one-time after-tax charge
> related almost entirely to the write-down of its investment in Capital Asset Holdings.
> Including the charge, second quarter net income declined 52 percent to $56.8 million.
> In addition, the company announced that its Board of Directors had authorized the
> repurchase of up to 7.5 million of outstanding common shares. The company will
> only repurchase shares under this program when it is economically attractive and
> within the constraints of the company's Triple-A claims-paying ratings. The company
> had approximately 100 million shares outstanding as of June 30, 1999.

60.    MBIA's financial results for the second quarter of 1999, the period ending June 30,

1999, were repeated in the Company's Form 10-Q filed with the SEC on August 13, 1999, which

was signed by defendant Budnick.

61.    On November 2, 1999, the Individual Defendants caused or allowed the Company to

issue a press release entitled "MBIA Inc. Reports 18 Percent Increase in Third Quarter Net Income."

The press release stated in relevant part:

> MBIA Inc., holding company for MBIA Insurance Corporation, reported today that
> third quarter net income rose 18 percent to $127.4 million from $108.2 million.
> Excluding one-time events, net income declined 2 percent to $122.4 million from
> $125.1 million. Third quarter earnings include a $5 million tax benefit, while last
> year's period included a $16.9 million after-tax charge for merger- and
> reorganization-related expenses.

62.    MBIA's financial results for the third quarter of 1999, the period ending September

30, 1999, were repeated in the Company's Form 10-Q filed with the SEC on November 12, 1999,

which was signed by defendant Budnick.

63.    On February 3, 2000, the Individual Defendants caused or allowed the Company to

issue a press release entitled "MBIA Inc. Reports 23 Percent Increase in Fourth Quarter Net Income;

Fourth Quarter Operating Earnings Up 4 Percent." The press release stated in relevant part:

> MBIA Inc., holding company for MBIA Insurance Corporation, reported today that
> fourth quarter net income increased 23 percent to $126.9 million from $103.4 million

22

in 1998's fourth quarter. Diluted earnings per share also increased 23 percent to $1.27 from $1.03 in the 1998 fourth quarter. Results from the 1998 fourth quarter include a one-time after-tax charge of $12.8 million or $0.13 per share related to the reorganization of the company's municipal services operations.

64. MBIA's financial results for the fourth quarter of 1999, the period ending December 31, 1999, were repeated in the Company's Form 10-K filed with the SEC on March 29, 2000, which was signed by defendants Brown, Elliott, Clapp, Dunton, Gaudiani, Gray, Johnson, Kearney, Lebenthal, Rolls, Weill and Budnick.

65. On May 4, 2000, the Individual Defendants caused or allowed the Company to issue a press release entitled "MBIA Inc. Reports Increase in First Quarter Net Income; First Quarter Operating Earnings Per Share Up 7 Percent." The press release stated in relevant part:

MBIA Inc., the holding company for MBIA Insurance Corporation, today reported that first quarter net income rose to $132.3 million. In the first quarter of 1999, the company took an after-tax charge of $114.5 million to increase its unallocated loss reserve, and reported net income of $9.4 million for that quarter. Excluding the one-time charge, first quarter net income rose 7 percent.

66. MBIA's financial results for the first quarter of 2000, the period ending March 31, 2000, were repeated in the Company's Form 10-Q filed with the SEC on May 15, 2000, which was signed by defendants Budnick and Hamilton.

67. On August 3, 2000, the Individual Defendants caused or allowed the Company to issue a press release entitled "MBIA Inc. Reports Solid Increase in First Half Earnings; Operating Earnings Per Share Rise 7 Percent in First Six Months." The press release stated in relevant part:

MBIA Inc., the holding company for MBIA Insurance Corporation, reported today that first half net income increased to $261.7 million from $66.2 million a year ago.

Excluding one-time after-tax charges of $179.5 million in the first half of 1999, first half 2000 net income rose 6 percent. The company took one-time charges of $65.0 million related almost entirely to the write-down of its investment in Capital Asset Holdings in the second quarter of 1999 and $114.5 million to increase the company's unallocated loss reserve in the first quarter of 1999.

68. MBIA's financial results for the second quarter of 2000, the period ending June 30, 2000, were repeated in the Company's Form 10-Q filed with the SEC on August 11, 2000, which was signed by defendants Budnick and Hamilton.

23

69.     On November 2, 2000, the Individual Defendants caused or allowed the Company to

issue a press release entitled "MBIA Inc. Reports Increase in Nine Months Net Income; Operating

Earnings Per Share Up 8 Percent in First Nine Months." The press release stated in relevant part:

> MBIA Inc., the holding company for MBIA Insurance Corporation, reported today
> that the first nine months' net income increased to $392.4 million from $193.6
> million in the same period last year. Excluding one-time charges of $174.5 million in
> the first nine months of 1999, net income increased 7 percent. One-time events in the
> 1999 period included an after-tax charge of $104.2 million to increase the company's
> unallocated loss reserve and a $70.3 million after-tax charge for investments in
> municipal services.

70.     MBIA's financial results for the third quarter of 2000, the period ending September

30, 2000, were repeated in the Company's Form 10-Q filed with the SEC on November 14, 2000,

which was signed by defendants Budnick and Hamilton.

71.     MBIA's financial results for the fourth quarter and year end of 2000, the period

ending December 31, 2000, were repeated in the Company's Form 10-K filed with the SEC on

March 30, 2001, which was signed by defendants Brown, Hamilton, Elliott, Clapp, Dunton,

Gaudiani, Gray, Johnson, Kearney, Lebenthal and Rolls.

72.     On May 3, 2001, the Individual Defendants caused or allowed the Company to issue a

press release entitled "MBIA Inc. Reports Strong Top Line Growth in Business Written in First

Quarter 2001 as Core Earnings Per Share Increase 5 Percent." The press release stated in relevant

part:

> MBIA Inc., the holding company for MBIA Insurance Corporation, today reported
> strong top line growth in business written for the first quarter as diluted core earnings
> per share rose 5 percent.
>
>      Diluted core earnings, which exclude the net income effects of net realized
> gains, premiums earned from refunded issues and changes in fair value of
> derivatives, increased to $0.86 per share compared with $0.82 per share in the first
> quarter of 2000. First quarter per share results reflect the effect of the 3-for-2 stock
> split effective April 20, 2001.

73.     MBIA's financial results for the first quarter of 2001, the period ending March 31,

2001, were repeated in the Company's Form 10-Q filed with the SEC on May 14, 2001, which was

signed by defendants Budnick and Hamilton.

74.    On August 2, 2001, the Individual Defendants caused or allowed the Company to

issue a press release entitled "MBIA Inc. Reports 9 Percent Increase in First Half Core Earnings Per

Share; First Half Operating Earnings Up 11 Percent to $1.85 Per Share." The press release stated in

relevant part:

> MBIA Inc., the holding company for MBIA Insurance Corporation, reported today
> solid results for the first half as diluted core earnings per share and diluted operating
> earnings per share rose 9 percent and 11 percent, respectively.
>
> Diluted core earnings, which exclude the net income effects of net realized
> gains, premiums earned from refunded issues and changes in the fair value of
> derivatives, increased to $1.76 per share in the first half from $1.62 in the same
> period a year ago. First half diluted operating earnings, which exclude the net income
> effects of net realized gains and changes in the fair value of derivatives, increased to
> $1.85 per share compared with $1.67 in the first half of last year.
>
> Diluted earnings per share decreased 1 percent in the first six months to $1.74
> from $1.76 in last year's first half. Excluding the cumulative effect of the accounting
> change for SFAS 133, diluted earnings per share rose 3 percent for the first half. Net
> income for the first half was $259.1 million compared with $261.7 million in the
> same period last year.
>
> Jay Brown, chairman and chief executive officer, said, "MBIA's solid results
> for the first half of the year and second quarter demonstrate continued progress
> toward achieving our long-term growth targets. This strong performance bodes well
> for continued favorable results for the remainder of the year and beyond."

75.    MBIA's financial results for the second quarter of 2001, the period ending June 30,

2001, were repeated in the Company's Form 10-Q filed with the SEC on August 13, 2001, which

was signed by defendants Budnick and Hamilton.

76.    On November 1, 2001, the Individual Defendants caused or allowed the Company to

issue a press release entitled "MBIA Inc. Reports 11 Percent Increase in Nine Months Core Earnings

Per Share; Operating Earnings Per Share Up 13 Percent in First Nine Months." The press release

stated in relevant part:

> MBIA Inc., the holding company for MBIA Insurance Corporation, reported today
> that the first nine months diluted core earnings per share and diluted operating
> earnings per share increased 11 percent and 13 percent, respectively.
>
> Diluted core earnings per share, which exclude the net income effects of net
> realized gains or losses, premiums earned from refunded issues and changes in the
> fair value of derivative instruments, increased to $2.71 in the first nine months from
> $2.44. First nine months diluted operating earnings, which exclude the net income
> effects of net realized gains or losses and changes in the fair value of derivative

25

instruments, rose to $2.86 per share compared with $2.53 in the first nine months of last year.

Diluted earnings per share were $2.77 for the first nine months of 2001, a 5 percent increase compared with $2.64 in the same period last year. Excluding the cumulative effect of the accounting change for SFAS 133, diluted earnings per share increased 8 percent for the first nine months. Net income for the first nine months increased 5 percent to $413.7 million from $392.4 million in the same period last year. Excluding the cumulative effect of the accounting change for SFAS 133, net income for the first nine months increased 9 percent.

77.    MBIA's financial results for the third quarter of 2001, the period ending September

30, 2000, were repeated in the Company's Form 10-Q filed with the SEC on November 13, 2001,

which was signed by defendants Budnick and Hamilton.

78.    MBIA's financial results for the fourth quarter and year end of 2001, the period

ending December 31, 2001, were repeated in the Company's Form 10-K filed with the SEC on

March 29, 2002, which was signed by defendants Brown, Hamilton, Elliott, Clapp, Dunton,

Gaudiani, Gray, Johnson, Kearney, Lebenthal and Rolls.

79.    On May 7, 2002, the Individual Defendants caused or allowed the Company to issue a

press release entitled "MBIA Inc. Reports 16 Percent Increase in First Quarter Operating Earnings

Per Share." The press release stated in relevant part:

MBIA Inc., the holding company for MBIA Insurance Corporation, today reported that diluted operating earnings were $1.04 per share in the first quarter, up 16 percent from $0.90 in last year's first quarter. Operating earnings exclude the net income effects of net realized gains or losses, the change in fair value of derivative instruments and the cumulative effect of accounting changes.

Diluted earnings per share rose 32 percent to $1.03 in the first quarter from $0.78 in the same period last year. Excluding the $0.05 per share effect from the adoption of SFAS 142 and the $0.09 per share effect from the adoption of SFAS 133 last year, diluted earnings per share increased 24 percent for the first quarter. Net income for the first quarter was $154.2 million compared with $116.1 million in the same period last year, a 33 percent increase.

80.    MBIA's financial results for the first quarter of 2002, the period ending March 31,

2002, were repeated in the Company's Form 10-Q filed with the SEC on May 14, 2002, which was

signed by defendants Budnick and Hamilton.

26

81.     On August 6, 2002, the Individual Defendants caused or allowed the Company to

issue a press release entitled "MBIA Inc. Reports 15 Percent Increase in First Half Net Income Per

Share." The press release stated in relevant part:

> MBIA Inc., the holding company for MBIA Insurance Corporation, reported today
> that diluted earnings per share increased 15 percent in the first six months to $2.00
> from $1.74 in last year's first half. Net income for the first half was $297.8 million
> compared with $259.1 million in the same period last year, also a 15 percent
> increase.

* * *

> MBIA Chairman Jay Brown said, "First half reported numbers were
> consistent with our long-term profitability targets but lagged our long-term earnings
> growth objectives. Although insurance segment new business rebounded in the
> second quarter, the combination of economic slowdown and capital markets
> volatility continues to make short-term insurance volume forecasts difficult. Despite
> the decline in insurance volume through the first six months, we continue to remain
> confident that we can grow our insurance writings in the high-single digits to low-
> double digits this year. Given the combination of our current asset balances, the level
> of interest rates and sluggish equity markets, we do not expect to see a rebound in
> our asset management business until early next year. In terms of MBIA overall
> performance in this economy, we are very satisfied with our first six months results."

82.     On August 14, 2002, the Individual Defendants caused or allowed the Company to

file its Form 10-Q, which also contained certifications submitted pursuant to Section 906 of the

Sarbanes-Oxley Act of 2002, which were signed by defendants Brown and Budnick. The Form 10-

Q stated in relevant part:

> (1) The Report fully complies with the requirements of section 13(a) or 15(d) of the
> Securities Exchange Act of 1934; and

> (2) The information contained in the Report fairly presents, in all material respects,
> the financial condition and result of operations of the Company.

83.     On November 5, 2002, the Individual Defendants caused the Company to issue a

press release entitled "MBIA Inc. Reports 12 Percent Increase in First Nine Months Net Income Per

Share." The press release stated in relevant part:

> MBIA Inc., the holding company for MBIA Insurance Corporation, reported today
> that diluted earnings per share increased 12 percent in the first nine months of 2002
> to $3.11 from $2.77 in last year's first nine months.

> Net income for the first nine months was $461.9 million compared with
> $413.7 million in the same period last year, also a 12 percent increase.

27

MBIA Chairman Jay Brown said, "Results for nine months continue the trends we have seen throughout 2002. As noted last quarter, the combination of economic slowdown and capital markets volatility continues to make short-term insurance volume forecasts difficult but new business opportunities remain extremely robust. We are very pleased with both our year-to-date insurance production and the resiliency of our current credit portfolio in these difficult times. Looking forward through the rest of this year and into 2003, we fully expect that the markets will continue to provide substantial opportunities for profitable growth in our financial guarantee business."

84.     MBIA's financial results for the third quarter of 2002, the period ending September 30, 2002, were repeated in the Company's Form 10-Q filed with the SEC on November 14, 2002. The Form 10-Q also contained certifications submitted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, which were signed by defendants Brown and Budnick. The certifications were identical to the certifications filed in the previous quarter.

85.     MBIA's financial results for the fourth quarter and year end of 2002, the period ending December 31, 2002, were repeated in the Company's Form 10-K filed with the SEC on March 31, 2003, which was signed by defendants Brown, Hamilton, Chaplin, Clapp, Dunton, Gaudiani, Johnson, Kearney, Lebenthal and Rolls. The Form 10-K also contained certifications submitted pursuant to Sections 302 and 906 of the Sarbanes-Oxley Act of 2002, which were signed by defendants Brown and Budnick. The certifications were identical to the certifications filed in the previous quarter.

86.     On May 6, 2003, the Individual Defendants caused or allowed the Company to issue a press release entitled "MBIA Inc. Reports 51 Percent Increase in First Quarter Earnings Per Share Operating Earnings Per Share up 11 Percent." The press release stated in relevant part:

MBIA Inc., the holding company for MBIA Insurance Corporation, reported today that net income for the first quarter was $223.3 million compared with $152.4 million in the same period last year, a 47 percent increase. First quarter diluted earnings per share increased 51 percent to $1.54 from $1.02 in 2002.

87.     MBIA's financial results for the second quarter of 2003, the period ending March 31, 2003, were repeated in the Company's Form 10-Q filed with the SEC on May 15, 2003, which was signed by defendants Budnick and Hamilton. The Form 10-Q also contained certifications submitted

pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, which were signed by defendants Brown and Budnick. The certifications were identical to the certifications filed in the previous quarter.

88.     On August 5, 2003, the Individual Defendants caused or allowed MBIA to issue a press release entitled "MBIA Inc. Reports 54 Percent Increase in First Half Net Income Per Share; Operating Earnings Per Share up 15 Percent in First Half of 2003." The press release stated in relevant part:

> MBIA Inc. the holding company for MBIA Insurance Corporation, reported today that diluted earnings per share increased 54 percent in the first six months to $3.04 from $1.98 in last year's first half. Net income for the first half was $441.2 million compared with $295.0 million in the same period last year, a 50 percent increase.
>
> * * *
>
> Neil G. Budnick, MBIA Chief Financial Officer, said, "MBIA recorded strong financial results for the first half of 2003, driven by increased insurance revenues. Earned premiums grew a very healthy 25 percent, reflecting strong top line production at very attractive pricing levels over the past few years. Demand for MBIA's guarantee across all sectors of the global capital markets continues to be strong and our insured portfolio has held up well in a stressful economic environment."

89.     MBIA's financial results for the second quarter of 2003, the period ending June 30, 2003, were repeated in the Company's Form 10-Q filed with the SEC on August 14, 2003, which was signed by defendants Budnick and Hamilton.

90.     The Form 10-Q contained certifications submitted pursuant to Sections 302 of the Sarbanes-Oxley Act of 2002, which were signed by defendants Brown and Budnick. The Form 10-Q stated in relevant part:

> 1.     I have reviewed the Quarterly Report of MBIA Inc. (the "Company") on Form 10-Q for the period ending June 30, 2003 as filed with the Securities and Exchange Commission on the date hereof (the "Report");
>
> 2.     Based on my knowledge, this Report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this Report;
>
> 3.     Based on my knowledge, the financial statements, and other financial information included in this Report, fairly present in all material respects the financial condition, results of operations and cash flows of the Company as of, and for, the periods presented in this Report;

4.      The Company's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the Company and have:

(a)      designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the Company, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this Report is being prepared;

(b)      evaluated the effectiveness of the Company's disclosure controls and procedures and presented in this Report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this Report based on such evaluation; and

(c)      disclosed in this Report that there were no change in the Company's internal control over financial reporting that occurred during the Company's second quarter of 2003 that has materially affected, or is reasonably likely to materially affect, the Company's internal control over financial reporting; and

5.      The Company's other certifying officers and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the Company's auditors and to the audit committee of the board of directors:

(a)      all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the Company's ability to record, process, summarize and report financial information; and

(b)      any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal control over financial reporting.

91.      The Form 10-Q also contained certifications submitted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, which were signed by defendants Brown and Budnick. The certifications were identical to the certifications filed in the previous quarter.

92.      On November 4, 2003, the Individual Defendants caused or allowed the Company to issue a press release entitled "MBIA Inc. Reports 42 Percent Increase in First Nine Months Net Income Per Share." The press release stated in relevant part:

MBIA Inc., the holding company for MBIA Insurance Corporation, reported today that diluted earnings per share increased 42 percent in the first nine months to $4.36 from $3.08 in last year's first nine months. Net income for the first nine months was $631.6 million compared with $457.7 million in the same period last year, a 38 percent increase.

Third quarter diluted earnings per share increased 19 percent to $1.31 from $1.10. Net income for the third quarter rose 17 percent to $190.4 million from $162.7 million in last year's third quarter.

* * *

Gary Dunton, MBIA president, said, "MBIA posted record top line production driven by very strong results from our domestic and international public finance operations. We are pleased that we were able to achieve this growth while maintaining our stringent underwriting and pricing standards. Strong demand for our guarantee continues unabated in the global capital markets."

93.    MBIA's financial results for the third quarter of 2003, the period ending September 30, 2003, were repeated in the Company's Form 10-Q filed with the SEC on November 13, 2003, which was signed by defendants Budnick and Hamilton.   The Form 10-Q also contained certifications submitted pursuant to Sections 302 and 906 of the Sarbanes-Oxley Act of 2002, which were signed by defendants Brown and Budnick.   The certifications were identical to the certifications filed in the previous quarter.

94.    On February 3, 2004, the Individual Defendants caused or allowed the Company to issue a press release entitled "MBIA Inc. Reports 43 Percent Increase in 2003 Earnings Per Share." The press release stated in relevant part:

> MBIA Inc., the holding company for MBIA Insurance Corporation, reported today that 2003 diluted earnings per share rose 43 percent to $5.61 per share compared with $3.92 in 2002. Net income for 2003 was $813.6 million compared with $579.1 million for 2002, a 40 percent increase.
>
> * * *
>
> "MBIA had its best year ever in 2003. Significant demand across our product lines resulted in record top line production and bottom line results as well as extraordinary high credit quality of business written. Our team did an excellent job of capitalizing on significant global market opportunities as over 40 percent of business production came from international operations. With an improving global economy and continuing strong demand for the financial guarantee product, MBIA's outlook remains favorable," said MBIA President Gary Dunton.
>
> * * *
>
> 2004-2006 Outlook
>
> As MBIA manages its business for the long-term, the company sets its goals and measures its performance over a three to five year period against certain economic benchmarks. MBIA's long-term growth target for new business production is in the 12-15 percent range over any three to five year period. Following three

31

. .

consecutive years of record ADP growth averaging 25 percent, the company expects that 2004 ADP will increase only slightly over 2003. ADP growth in 2005-2006 should return to more historic levels. The very strong new business production over the last three years should drive scheduled earned premium growth to 15-20 percent in 2004-2006, significantly higher than the company's long-term target of 12-15 percent range.

The long-term growth objective for MBIA's investment portfolio and after-tax investment income is in the 8-10 percent range. Growth in invested assets should continue to offset the impact of the low-yield environment and the shortened duration of the investment portfolio. Consequently, growth in 2004-2006 is expected to fall at least within the 8-10 percent range for invested assets and after-tax investment income.

The company's long-term goal is to contain insurance operating expenses to the 5-7 percent range per year. While expenses in 2003 exceeded that range due to nonrecurring items, expense growth for 2004-2006 is expected to fall within the targeted range.

The dramatic decline in equity assets under management over the last three years caused MBIA's asset management business results to fall well below its long-term target growth rate of 14-17 percent. However, based on the continued strong performance of the company's fixed-income operations, asset management performance for 2004-2006 is expected to be well within the company's long-term target.

The company expects that operating ROE will be in the 13-14 percent range in 2004-2006, short of its 15 percent long-term target due to its strong capital position and low investment yields. Operating EPS is expected to fall within the company's long-term target range of 12-15 percent for 2004-2006 driven by strong earned premium growth.

95.     MBIA's financial results for the fourth quarter and year end of 2003, the period

ending December 31, 2003, were repeated in the Company's Form 10-K filed with the SEC on

March 12, 2004, which was signed by defendants Brown, Hamilton, Chaplin, Clapp, Dunton,

Gaudiani, Johnson, Lebenthal and Rolls. The Form 10-K also contained certifications submitted

pursuant to Sections 302 and 906 of the Sarbanes-Oxley Act of 2002, which were signed by

defendants Brown and Budnick. The certifications were identical to the certifications filed in the

previous quarter.

96.     On May 4, 2004, the Individual Defendants caused or allowed the Comopany to issue

a press release entitled "MBIA Inc. Reports 8 Percent Decrease in First Quarter Earnings Per Share."

The press release stated in relevant part:

32

MBIA Inc., the holding company for MBIA Insurance Corporation, reported today that net income for the first quarter was $223.6 million compared with $223.3 million in the same period last year, a 7 percent decrease. First quarter diluted earnings per share decreased 8 percent to $1.42 from $1.54 in 2003.

\* \* \*

Gary Dunton, MBIA president, said, "While MBIA's operating income for the first quarter was solid, significantly lower new business production was a disappointment. The quarter was characterized by tighter spreads, which decreased insured penetration across all markets and increased competition. While business activity has accelerated recently, the weak first quarter will make it difficult to match 2003's record new business production. Over the longer term, we remain confident that the global capital markets will continue to expand, providing attractive opportunities for new business growth."

97.    MBIA's financial results for the first quarter of 2004, the period ending March 31, 2004, were repeated in the Company's Form 10-Q filed with the SEC on May 7, 2004, which was signed by defendants Budnick and Hamilton. The Form 10-Q also contained certifications submitted pursuant to Sections 302 and 906 of the Sarbanes-Oxley Act of 2002, which were signed by defendants Dunton and Budnick. The certifications were identical to the certifications filed in the previous quarter.

98.    On August 3, 2004, the Individual Defendants caused or allowed the Company to issue a press release entitled "MBIA Inc. Reports 5 Percent Decrease in First Half Net Income Per Share." The press release stated in relevant part:

MBIA Inc., the holding company for MBIA Insurance Corporation, reported today that diluted earnings per share decreased 5 percent in the first six months of 2004 to $2.90 from $3.04 in last year's first half. Net income for the first half of 2004 was $424.7 million compared with $441.2 million in the same period last year, a 4 percent decrease.

\* \* \*

Gary C. Dunton, MBIA Chief Executive Officer, said, "MBIA posted strong results for the second quarter of 2004. While our pipeline of new business opportunities remains steady, difficult market conditions will make it unlikely that the company will match last year's record new business production. However, we remain confident that the market will return to a more balanced view of risk and that demand for our product will grow over the long-term as the global capital markets continue to expand."

99.     MBIA's financial results for the second quarter of 2004, the period ending June 30, 2004, were repeated in the Company's Form 10-Q filed with the SEC on August 6, 2004, which was signed by defendants Ferreri and Hamilton. The Form 10-Q also contained certifications submitted pursuant to Sections 302 and 906 of the Sarbanes-Oxley Act of 2002, which were signed by defendants Dunton and Ferreri. The certifications were identical to the certifications filed in the previous quarter.

100.     On November 2, 2004, the Individual Defendants caused or allowed the Company to issue a press release entitled "MBIA Inc. Reports 4 Percent Decrease in First Nine Months Net Income Per Share; Operating Earnings Per Share up 10 Percent in First Nine Months." The press release stated in relevant part:

> MBIA Inc., the holding company for MBIA Insurance Corporation, reported today that diluted earnings per share decreased 4 percent in the first nine months of 2004 to $4.19 from $4.36 in last year's first nine months. Net income for the first nine months of 2004 was $610.8 million compared with $631.6 million in the same period last year, a 3 percent decrease.

> \* \* \*

> Gary C. Dunton, MBIA Chief Executive Officer, said, "MBIA posted solid operating results for the first nine months of 2004, despite the challenging market environment for new business production. We remain determined to aggressively pursue high-quality, profitable business without compromising our underwriting and pricing discipline. Although top line production can fluctuate considerably from year to year, we are confident that we can profitably grow our business at historical levels over the longer term."

101.     MBIA's financial results for the third quarter of 2004, the period ending September 30, 2004, were repeated in the Company's Form 10-Q filed with the SEC on November 5, 2004, which was signed by defendants Ferreri and Hamilton. The Form 10-Q also contained certifications submitted pursuant to Sections 302 and 906 of the Sarbanes-Oxley Act of 2002, which were signed by defendants Dunton and Ferreri. The certifications were identical to the certifications filed in the previous quarter.

34

102. On November 17, 2004, the Individual Defendants caused or allowed the Company to

issue a press release entitled "MBIA Prices $350 Million of 30-Year Senior Notes." The press

release stated in relevant part:

> MBIA Inc. announced the pricing of a public offering of $350 million aggregate
> principal amount of senior notes due 2034. The issue carries a fixed coupon of 5.70
> percent and the offering price to the public is 99.585 percent of the principal amount.
> The sale of the notes is expected to close on November 24, 2004.
>
> Proceeds of the debt offering will be used to redeem the outstanding $50
> million aggregate principal amount of MBIA's 6.95 percent notes due 2038 and for
> general corporate purposes. It is also anticipated that proceeds will be used to redeem
> the outstanding $100 million aggregate principal amount of MBIA's 8.00 percent
> notes due 2040 (NYSE:MBE) in December 2005.

## THE TRUTH BEGINS TO EMERGE

103. On November 18, 2004, the Individual Defendants caused or allowed the Company to

issue entitled "MBIA Receives Document Subpoenas Regarding 'Non-Traditional Products.'" The

press release stated in relevant part:

> MBIA Inc. announced that it received identical document subpoenas today from the
> Securities and Exchange Commission and the New York Attorney General's office
> requesting information with respect to non-traditional or loss mitigation insurance
> products developed, offered or sold by MBIA to third parties from January 1, 1998 to
> the present.
>
> ***The subpoenas do not identify any specific transaction, and MBIA believes
> the subpoenas were issued in connection with an industry-wide investigation of
> non-traditional insurance products. MBIA intends to cooperate fully with the
> Securities and Exchange Commission and the New York Attorney General's
> request for documents.***

104. On November 23, 2004, the Individual Defendants caused or allowed the Company to

issue a follow-up press release entitled "MBIA Provides Additional Information Regarding

Subpoenas." The press release stated in relevant part:

> On Thursday, November 18, MBIA Inc. announced that it had received identical
> document subpoenas from the Securities and Exchange Commission and the New
> York Attorney General's office requesting information with respect to non-traditional
> or loss mitigation insurance products developed, offered or sold by MBIA to third
> parties from January 1, 1998 to the present. The subpoenas did not identify any
> specific transaction.

* * *

35

> *In a subsequent call made by the Company to the SEC, a representative of the SEC indicated that the investigation will include the reinsurance arrangements entered into by MBIA in 1998 in connection with the bankruptcy of the Delaware Valley Obligated Group (DVOG), an entity that is part of Pittsburgh-based Allegheny Health, Education and Research Foundation (AHERF).*

105.    On February 1, 2005, the Individual Defendants caused or allowed MBIA to issue a

press release entitled "MBIA Inc. Reports 1 Percent Decrease in 2004 Earnings Per Share; Operating

Earnings Per Share up 10 Percent in 2004." The press release stated in relevant part:

> MBIA Inc., the holding company for MBIA Insurance Corporation, reported today that 2004 diluted earnings per share declined 1 percent to $5.55 per share compared to $5.61 in 2003. Net income for 2004 was $804.1 million compared to $813.6 million for 2003, a 1 percent decrease.
>
> * * *
>
> Gary Dunton, MBIA Chief Executive Officer, said, "MBIA's financial and operating results for 2004 were solid, despite a very challenging market environment characterized by tight credit spreads and increased levels of competition. New business production in insurance operations, while down from last year's record results, was still among the highest in the company's history. Critical to the long-term success of our franchise, we continued to maintain our strict underwriting standards in this demanding environment."
>
> Mr. Dunton added, "While we believe that current market conditions will likely continue this year, we have a solid pipeline across most of our product lines. For 2005, we expect operating earnings per share, excluding refundings, to increase by 10 to 12 percent, but then return to the 12 to 14 percent growth range in 2006-2007. We anticipate that operating ROE will be at the lower end of the 12 to 14 percent range in 2005 due to our strong capital position and the projected decline in refunding volume. Looking forward to 2006 and 2007, we expect that operating ROE will improve and be within the 12 to 14 percent range. We continue to manage MBIA to provide long-term growth in shareholder value, and we remain very optimistic about the prospects for our global franchise."

106.    Then, on March 8, 2005, the Individual Defendants caused or allowed the Company

to issue a press entitled "MBIA to Restate Financial Statements for 1998 and Subsequent Years."

The press release stated in relevant part:

> MBIA Inc. announced today that it has decided to restate its financial statements for 1998 and subsequent years. *The restatement is being made to correct the accounting treatment for two reinsurance agreements that MBIA entered into in 1998 with Converium Re* (previously known as Zurich Reinsurance North America). The restatement will not have a material effect on MBIA's financial position, and MBIA does not expect the restatement to have any effect on its ratings or on the Triple-A ratings of MBIA Insurance Corporation.

36

As a result of this restatement, MBIA's financial results for 1998 will reflect a third quarter incurred loss of $70 million related to $265 million of bonds insured by MBIA that were issued by Allegheny Health, Education and Research Foundation (AHERF). The after-tax loss will be approximately $47 million, resulting in net income for the year of approximately $386 million, or $2.57 per share, down 11% from $433 million or $2.88 per share as originally reported.

MBIA estimates that its earnings will be reduced by approximately $6 million (or four cents per share) in 1999, $4 million (or 3 cents per share) in 2000, $3 million (or two cents per share) in 2001 and will have a de minimis effect in 2002. MBIA estimates that its earnings will increase by approximately $2 million (or one cent per share) in 2003 and $4 million (or three cents per share) in 2004. The Company expects to finalize these estimates and file its 2004 audited financial statements in its 10K by the March 16 deadline. The restatement could result in a delay in this filing.

The two reinsurance agreements with Converium consisted of an excess of loss agreement and a quota share agreement. Under the excess of loss reinsurance agreement, Converium reimbursed MBIA for $70 million of the $170 million loss experienced by MBIA in the third quarter of 1998 on the $265 million of MBIA-insured bonds issued by AHERF, which was recorded as an offset to the loss. Under the reinsurance agreement, MBIA agreed to cede to Converium on a quota share basis new business written with an aggregate of $101 million in net ceded premiums over a six-year period ending October 1, 2004, which was accounted for in the same manner as other quota share treaties.

Under separate agreements to which MBIA was not a party, Converium reinsured the risk that it assumed from MBIA under the quota share agreement for losses in excess of $13 million to AXA Re Finance S.A. (ARF), a subsidiary of AXA Re S.A. ARF contended that, in connection with its agreement to assume this risk from Converium, there was an oral agreement with MBIA under which MBIA would replace ARF as a reinsurer to Converium by no later than October 2005.

In October 2004, MBIA management recommended that the Audit Committee of the Board of Directors undertake an investigation of the AHERF reinsurance arrangement, including whether such an oral agreement existed between MBIA and ARF. The Audit Committee retained outside counsel and initiated an investigation in October 2004. The outside counsel's investigation has been substantially completed. While the investigation has not conclusively determined whether an oral agreement in fact existed, MBIA has been advised, however, that it appears likely that such an agreement or understanding with ARF was made in 1998.

In light of this additional information, MBIA has decided to correct its accounting for the agreements and restate its 1998 and subsequent financial statements with respect to the Converium excess of loss agreement and the quota share agreement. MBIA now believes that the appropriate accounting treatment for the excess of loss and quota share reinsurance agreements with Converium is to record the $70 million paid by Converium under the excess of loss agreement as a deposit and to record the subsequent premium cessions under the quota share agreement as a repayment of the deposit with imputed interest.

As previously disclosed, in November 2004 MBIA received subpoenas from the Securities and Exchange Commission (SEC) and the New York Attorney's General Office (NYAG) related to non-traditional reinsurance arrangements,

37

including the AHERF reinsurance transaction. The company is cooperating fully with the SEC and the NYAG in their investigations.

In addition to the agreements with Converium related to AHERF, MBIA had agreements with two other reinsurers, ARF and Munich Re, under which those reinsurers reimbursed MBIA for $100 million of AHERF losses incurred by MBIA. MBIA also separately entered into quota share reinsurance agreements with these reinsurers under which it agreed to cede on a quota share basis new business written with an aggregate of $97 million in adjusted gross premiums to ARF and $98 million in adjusted gross premiums to Munich Re over a six-year period ending October 1, 2004. These reinsurers assumed new risk on a pro rata basis in exchange for these premiums. MBIA continues to believe that its accounting for the excess of loss and quota share agreements with ARF and Munich Re is appropriate.

In the fourth quarter of 2004, MBIA assumed from ARF the previously ceded policies that ARF had assumed directly from MBIA under its quota share agreement with MBIA and also reinsured ARF for substantially all of the business that ARF assumed from Converium under the Converium quota share agreement.

107.   On March 9, 2005, the Individual Defendants caused or allowed the Company to

issue a press release entitled "MBIA Receives Additional Document Subpoena Regarding AHERF

Reinsurance Agreements." The press release stated in relevant part:

MBIA Inc. announced today that it had received a subpoena from the U.S. Attorney's Office for the Southern District of New York seeking information related to the reinsurance agreements it entered into in connection with the loss it incurred in 1998 on bonds insured by MBIA Insurance Corp. that were issued by Allegheny Health, Education and Research Foundation (AHERF).

These matters are currently under investigation by the Securities and Exchange Commission and the New York State Attorney General's Office, with which the Company has been cooperating. The Company intends also to cooperate fully with the U.S. Attorney's Office.

## THE TRUTH IS REVEALED

108.   Finally, on March 30, 2005, the Individual Defendants caused or allowed the

Company to issue a press release entitled "MBIA Document Subpoenas Supplemented," to advise

the public that the previously-announced investigations had now been broadened and intensified.

The press release stated in relevant part:

MBIA Inc. announced that today it received additional requests from the New York Attorney General's Office (NYAG) and the Securities and Exchange Commission (SEC) that supplement the subpoenas it received in late 2004.

The requests seek documents relating to the Company's accounting treatment of advisory fees; its methodology for determining loss reserves and case reserves; instances of purchase of credit default protection on itself; and documents relating to Channel Reinsurance Ltd., a reinsurance company of which MBIA is part owner. The requests cover the period January 1, 2000 to the present.

109.   Upon this news, shares of the Company's stock fell $4.36 per share, or over 7%, to close at $52.28 per share, on unusually heavy trading volume.

110.   On August 22, 2005, *Market Watch* published an article entitled "MBIA may be sued by SEC: Bond insurer trying to resolve finite reinsurance charges." The article stated in relevant part:

> MBIA Inc., one of the largest bond insurers, could be the target of a civil lawsuit by the Securities and Exchange Commission over its use of a controversial type of reinsurance that regulators worry has been abused by several companies.
>
> Armonk, New York-based MBIA said late Friday that it received a "Wells Notice" from the SEC informing the company that the agency's staff has recommended civil action against it for breaking federal securities laws.
>
> A Wells Notice gives the recipient a chance to persuade the SEC not to take action and MBIA said it's in discussions with the regulator to try to resolve the charges.
>
> MBIA also said it's talking with the office of New York Attorney General Eliot Spitzer and the New York Insurance Department to resolve any civil charges that Spitzer may bring.
>
> MBIA shares climbed 11 cents to $58.55 on Monday. They've dropped more than 7% so far this year. In April, the stock was down more than 20%.
>
> As a leading insurer of future bond payments, MBIA is a lynchpin of debt markets, so the outcome of regulators' investigations could have an impact beyond the company's reputation and financial health.
>
> MBIA's legal tussles stem from the company's use of finite reinsurance to cover losses it incurred from the 1998 bankruptcy of Pennsylvania non-profit hospital group Allegheny Health, Education and Research Foundation (AHERF).
>
> Reinsurance is purchased by insurers to pass on a portion of the risk of the policies they sell. Finite reinsurance is a blend of traditional reinsurance and financing that transfers a smaller amount of risk from the buyer to the seller.
>
> Regulators including Spitzer and the SEC are investigating whether companies have used finite reinsurance to manipulate their financial statements.

Problems occur when a finite contract transfers little or no risk from the buyer to the seller. In those cases, the agreement must be accounted for as a loan, rather than reinsurance (which gets much more favorable accounting treatment.)

If questionable contracts are still accounted for as reinsurance, it can make the buyer look more financially strong that it actually is, misleading investors and regulators.

The probes precipitated the departure of longtime American International Group Chief Executive Maurice "Hank" Greenberg earlier this year and forced the giant insurer to admit a series of accounting improprieties and restate five years of earnings.

MBIA also admitted missteps in the way it accounted for finite reinsurance.

AHERF transaction

MBIA said in March that it accounted incorrectly for a two-part reinsurance deal struck in 1998 with Converium Re) to cover AHERF losses.

Converium is an independent reinsurer, but was part of Swiss insurer Zurich Financial Services at the time.

MBIA had insured $265 million worth of bonds issued by AHERF. When the hospital group went bust in 1998, MBIA had to pay $170 million.

In the first part of the reinsurance pact, Converium Re agreed to reimburse MBIA $70 million of the $170 million loss. MBIA then passed $101 million of new business premiums to Converium Re.

Converium Re then reinsured the risk it had taken on from MBIA with Axa Re Finance (ARF), part of French insurer Axa SA, MBIA said.

ARF claimed it had an oral agreement with MBIA under which MBIA would replace ARF as the reinsurer of Converium Re before October 2005.

An internal investigation by MBIA concluded that this oral agreement probably existed.

The agreement effectively limited the risk transferred from MBIA to Converium Re.

MBIA said that, in light of the oral agreement with ARF, it would record the $70 million it got from Converium Re as a loan, rather than reinsurance as it had originally done.

It also accounted for the $101 million in premiums it passed to Converium as a repayment of the loan, plus interest.

The change meant MBIA's third-quarter 1998 results included a $70 million loss related to its insurance of AHERF bonds.

That, in turn, knocked $47 million off MBIA's previously reported full-year 1998 net income - reducing it by 11 percent, the company said.

40

111.   On September 6, 2005, *Bloomberg* published an article entitled "MBIA's Former

CEO Elliott Probed over Reinsurance, People Say." The article stated in relevant part:

> MBIA Inc.'s former chairman and chief executive officer, David H. Elliott, is being investigated by federal prosecutors in connection with a reinsurance agreement that caused the world's biggest bond insurer to restate seven years of earnings, people familiar with the matter said.

> The U.S. attorney in Manhattan is probing whether Elliott approved a secret arrangement to cover losses that were supposed to be paid by another insurer, the people said. Witnesses have told investigators that he blessed the 1998 side deal, they said. Elliott's attorney, Steven Peikin of Sullivan & Cromwell in New York, declined to comment.

> "Any agreement that starts with the word 'side' is suspect," said E. Lawrence Barcella Jr., a white-collar criminal defense lawyer at Paul, Hastings, Janofsky & Walker in Washington and a former federal prosecutor. "The government, particularly the Southern District of New York, is being very aggressive across the board on these things."

> Elliott, 63, is one of the most senior executives under investigation by state and federal prosecutors probing abuses in accounting for reinsurance, purchased by insurance companies to limit their losses. A Boston University law school graduate, he became MBIA's CEO in 1992, chairman in 1994, and retired from both positions in 1999.

> Government accounting inquiries ended the almost 40-year reign of former American International Group Inc. CEO Maurice "Hank" Greenberg, accused of deceiving regulators and investors in a civil suit by New York Attorney General Eliot Spitzer.

> Former CFO's Role

> MBIA, based in Armonk, New York, reduced the net income reported for 1998 through 2004 by $54 million on March 8 to fix past accounting entries on the reinsurance policies. MBIA bought the policies to limit losses caused by the failure of a hospital network in Philadelphia.

> Prosecutors for the U.S. attorney in New York, David Kelley, are also examining what current MBIA executives such as Chairman Joseph "Jay" Brown may have known about the arrangement before it came to light last year, the people said. Brown succeeded Elliott as CEO in January 1999 and held the post until March 2004, when Gary Dunton replaced him.

> Kelley subpoenaed MBIA, asking for relevant evidence, the day after its restatement. The Securities and Exchange Commission is investigating the same matter, the people said.

> Any case against Elliott may hinge on the role played by Julliette Tehrani, a former MBIA chief financial officer, in the 1998 side agreement, the people said. Investigators have evidence that Tehrani, 58, was directly involved, they said. She

quit as CFO in September 1998 to become "special assistant" to then-Chairman Elliott, and no longer works at MBIA.

## Official Comment

Elliott, Tehrani and Brown, 56, haven't been accused of wrongdoing by U.S. prosecutors or regulators. MBIA spokesman Michael Ballinger declined to comment.

"I'm unable to make any comment right now," Tehrani said on Aug. 31 at her home in Stamford, Connecticut. ``My lawyer told me not to talk to anyone." John Lang, Tehrani's lawyer at Loeb & Loeb in New York, also declined to comment.

Herb Hadad, a spokesman for Kelley, who ends his term as U.S. attorney today, declined to comment. SEC spokesman John Nester also declined to comment.

MBIA said on Aug. 19 that it was talking with the SEC and Spitzer about possible civil settlements of probes relating to the 1998 reinsurance agreement. Since MBIA said on Nov. 18 that it received subpoenas from Spitzer and the SEC, the company's shares have fallen 9.8 percent.

Regulators are examining instances in which insurers mask losses or inflate capital by classifying what is essentially a low-cost loan as reinsurance in cases involving little or no transfer of risk.

## Side Agreements

In some cases, side agreements are used to set secret limits on the losses reinsurers will pay. U.S. and Australian regulators are probing whether Berkshire Hathaway Inc.'s General Re unit used them to help hide the financial weaknesses of insurers that later collapsed. Neither Berkshire, headed by billionaire Warren Buffett, nor its General Re unit has been accused of wrongdoing. Berkshire has said it's cooperating with regulators.

MBIA bought $170 million in reinsurance from three companies, Converium Holding AG, Axa SA and Munich Re, after Allegheny Health, Education & Research Foundation's Philadelphia hospitals filed for bankruptcy in July 1998, according to company filings. The company had guaranteed payment of $265 million of bonds sold by the hospital operator.

Converium reimbursed $70 million of MBIA's losses. In return, MBIA agreed to give new business to the company, based in Zug, Switzerland. Converium bought reinsurance from Paris- based Axa to cover its own losses, MBIA said in March.

## Axa Claims

Prosecutors are investigating claims made by Axa that MBIA orally agreed to cover Converium's losses above a certain level. In March, MBIA said it was "likely" that the oral agreement existed. The company's investigation hadn't conclusively made that determination.

MBIA told investors in November 1998 that Allegheny's bankruptcy didn't affect profits because of its reinsurance.

Last year, the audit committee of MBIA's board hired Debevoise & Plimpton, a New York-based law firm, to examine the company's accounting for the policies after Axa sued in France, the people familiar with the matter said.

MBIA settled the dispute last October, in part by agreeing to "assume" the policies from Axa, according to MBIA's annual report. The arrangement ultimately shifted the risk of loss on the Allegheny bonds back to MBIA, eliminating the justification for favorable insurance accounting.

Channel Reinsurance

MBIA in March corrected the seven years of earnings to record Converium's $70 million payment in 1998 as a deposit, rather than insurance proceeds. The restatement cut net income from 1998 through 2002 by $60 million and raised 2003 and 2004 profit by $6 million.

Elliott remains chairman of Channel Reinsurance Ltd., a Bermuda-based firm formed by MBIA and three other companies in 2004. Spitzer and the SEC subpoenaed MBIA for documents relating to Channel Reinsurance in March.

The regulatory investigations of reinsurance triggered a broad review of AIG's accounting practices, leading to a $3.9 billion earnings restatement. Lawyers for Greenberg, 80, have said much of the restatement was unnecessary and motivated by fear of regulators. Greenberg's lawyers have also said he will contest the allegations in Spitzer's lawsuit.

112. On November 8, 2005, the Individual Defendants caused or allowed the Company to

file a Form 8-K with the SEC, which stated in relevant part:

On November 8, 2005, the Company announced that it is restating its financial statements for 1998 and thereafter in connection with potential settlements of investigations by the Securities Exchange Commission, the New York Attorney General's Office and the New York State Insurance Department (the" Regulatory Agencies") regarding agreements entered into by its subsidiary, MBIA Insurance Corporation, in 1998 with AXA Re Finance S.A. ("AXA Re"), Muenchener Rueckversicherungs-Gesellshaft ("Munich Re") and Converium Re (previously known as Zurich Reinsurance North America). The restatement will correct and restate the Company's accounting for the agreements it entered into with Munich Re and AXA Re. As a result, the Company will account for these agreements as deposits because they did not satisfy the risk transfer requirements for reinsurance accounting under SFAS 113, "Accounting and Reporting for Reinsurance of Short-Duration and Long-Duration Contracts" and under Regulation 108 of the New York State Insurance Department. Accordingly, the financial statements referred to in this paragraph should no longer be relied upon.

As a result of this restatement, MBIA's financial results for 1998 will reflect an additional pre-tax charge in the third quarter of $100 million, which is related to the $170 million incurred loss on the MBIA-insured AHERF bonds. The estimated reduction of after-tax net income for 1998 related to the restatement will be approximately $69 million, resulting in net income for 1998 of approximately $317 million, or $2.11 per share, down 18% from $386 million, or $2.57 per share, as previously reported. In addition, as a result of the restatement, MBIA estimates that its earnings will be reduced by approximately $4 million (or 3 cents per share) in

43

1999 and increased by approximately: $0.3 million (or 0 cents per share) in 2000; $2 million (or 1 cent per share) in 2001; $5 million (or 3 cents per share) in 2002; $15 million (or 10 cents per share) in 2003; $30 million (or 21 cents per share) in 2004; and $5 million (or 3 cents per share) for the first nine months of 2005. As announced on March 8, 2005, the Company has already restated its financial statements with respect to its agreements with Converium Re.

The quota share agreements with Munich Re, which were entered into in connection with the Munich Re excess-of-loss agreement, remain in effect and obligate Munich Re to reimburse MBIA on a quota share basis for any losses incurred on approximately $11.8 billion of debt service ceded. As previously reported, MBIA's quota share agreements with AXA Re, which were entered into in connection with the AXA Re excess-of-loss agreement, were commuted in the fourth quarter of 2004.

To date, no settlements have been approved by the regulatory agencies. Any settlements may have additional or different terms.

In addition, MBIA is restating results from 2001 to 2005 for derivative transactions that do not technically comply with SFAS 133, "Accounting for Derivative Instruments and Hedging Activities", even though those transactions were highly effective from an economic standpoint. The effect of the restatement is an increase to net income of $14.7 million for the first nine months and

$19.7 million for the third quarter. The cumulative effect of these changes, from 2001 through September 2005, is a non-cash earnings increase of $6.8 million. Although the cumulative effect of $6.8 million is not material, since the Company is restating its financial results for the Munich Re and AXA Re reinsurance agreements, it will restate each quarter and year affected by the prior method of accounting.

The Company reached its conclusion regarding the non-reliance on November 4, 2005. The Chair of the Audit Committee of the Company's Board of Directors, as well as authorized officers of the Company, have discussed the matters disclosed in this Current Report on Form 8-K pursuant to this Item 4.02(a) with Pricewaterhouse Coopers LLP, the Company's independent registered public accounting firm.

113.    On November 14, 2005, the Individual Defendants caused or allowed the Company to

file a Form 10-Q with the SEC, which stated in relevant part:

On November 8, 2005, the Company announced that it was in discussions with the SEC, the NYAG and the New York State Insurance Department regarding potential settlements of their investigations into agreements entered into by MBIA Corp. in connection with the AHERF matter. In connection with the potential settlements, the Company announced that it was restating its financial statements to correct and restate its GAAP and statutory accounting for 1998 and subsequent years as discussed in Note 2 to the Consolidated Financial Statements of MBIA Inc. and Subsidiaries included in Part I, Item 1 and "Restatement of Consolidated Financial Statements" in Management's Discussion and Analysis of Financial Condition and Results of Operations included in Part I, Item 2. In connection with the proposed settlements, the Company accrued $75 million for the total amount the Company estimates, based on discussions to date, it will have to pay in connection with any settlements.

The Company has been cooperating, and is continuing to cooperate fully with the investigations by the SEC, the NYAG, the New York State Insurance Department and the U.S. Attorney. To date, no settlements have been approved by the regulatory agencies, and no assurance can be given that any settlements will be approved. Any settlements may have additional or different terms.

114.    On February 9, 2006, the Individual Defendants caused or allowed the Company to

issue a press release entitled "MBIA Inc. Reports 11 Percent Decrease in 2005 Earnings Per Share;

Operating Earnings Per Share up 4 Percent in 2005." The press release stated in relevant part:

MBIA Inc., the holding company for MBIA Insurance Corporation, reported today that 2005 diluted earnings per share declined 11 percent to $5.18 per share compared with $5.82 in 2004. Net income for 2005 was $711.0 million compared with $843.0 million for 2004, a 16 percent decrease. The decrease was due to the effect of net realized losses of $0.04 per share in 2005, compared with net realized gains of $0.47 per share recorded in 2004, as well as a charge of $0.52 per share related to a $75 million accrual that the Company made in the third quarter of 2005 for estimated penalties and disgorgement related to any settlements of regulatory investigations.

Net income for 2005 includes the effects of a $75 million accrual in the third quarter for the total amount that the Company estimates it will have to pay in connection with any settlements of investigations by the SEC, the New York Attorney General's Office and the New York State Insurance Department regarding agreements MBIA Insurance Corporation entered into in 1998 with AXA Re Finance S.A. (AXA Re), Muenchener Rueckversicherungs-Gesellshaft (Munich Re) and Converium Re (previously known as Zurich Reinsurance North America).

115.    On March 3, 2006, the Individual Defendants caused or allowed the Company to file

a Form 10-K with the SEC, which stated in relevant part:

In the fourth quarter of 2005, MBIA Inc. (the "Company") restated it consolidated financial statements as of and for the years ended December 31, 2004, 2003, 2002, 2001, 2000, 1999 and 1998, and the Notes related thereto, as further discussed in "Note 2: Restatement Of Consolidated Financial Statements" in the Notes to Consolidated Financial Statements of MBIA Inc. and Subsidiaries included in Part II, Item 8 and Management's Discussion and Analysis of Financial Condition and Results of Operations included in Part II, Item 7.

In connection with potential settlements of investigations by the Securities and Exchange Commission (the "SEC") and the New York Attorney General's Office ("NYAG") regarding agreements entered into by its subsidiary, MBIA Insurance Corporation, in 1998 with AXA Re Finance S.A. ("ARF"), Muenchener Rueckversicherungs-Gesellshaft ("Munich Re") and Converium Re (previously known as Zurich Reinsurance North America) in connection with losses incurred by MBIA Insurance Corporation on insured bonds issued by Allegheny Health, Education and Research Foundation ("AHERF"), as announced on March 8, 2005, the Company restated its financial statements with respect to the agreements with Converium Re. At that time, the Company believed that the accounting for the agreements with ARF and Munich Re was appropriate under Statement of Financial Accounting Standards ("SFAS") 113, "Accounting and Reporting for Reinsurance of Short-Duration and Long-Duration Contracts." As announced on November 8, 2005,

45

the Company restated its financial statements for the agreements with ARF and Munich Re, made in connection with the potential settlements, to correct and restate its accounting for these agreements because, taking into account developments in the regulatory investigations since March and further accounting analyses, these agreements did not satisfy the risk transfer requirements for reinsurance accounting under SFAS 113. As a result, the Company restated its previously issued financial statements to reflect the agreements with Munich Re and ARF under deposit accounting in accordance with Statement of Position ("SOP") 98-7, "Deposit Accounting: Accounting for Insurance and Reinsurance Contracts That Do Not Transfer Risk" instead of under reinsurance accounting. The Company also corrected and restated its 2004 statutory financial statements because they did not satisfy the requirements for reinsurance accounting under Regulation 108 of the New York State Insurance Department ("NYSID").

Additionally, in the third quarter of 2005, the Company completed a detailed review of its derivative instruments for which it applied shortcut method hedge accounting under SFAS 133, "Accounting for Derivative Instruments and Hedging Activities," as amended. Shortcut method hedge accounting allows the assumption that the change in fair value of a hedged item exactly offsets the change in fair value of the related derivative. After completing its review, the Company determined that certain hedging relationships did not meet every technical aspect of shortcut method hedge accounting, although, such hedging relationships would have qualified for basic hedge accounting. Since the documentation that the Company prepared was designed to support shortcut method hedge accounting, it was not sufficient to support basic hedge accounting. As a result, the Company must account for these derivatives, from 2001 to the present, as if they were not part of hedging relationships, which requires the change in fair value of these derivatives to be reflected in the Company's income statement without an offsetting change in fair value of the hedged items. The Company restated its financial statements to correct the accounting for these derivatives for the year ended December 31, 2001 and subsequent periods through June 30, 2005. As of October 1, 2005, all of the subject hedging relationships met the requirements for basic hedge accounting and have been recorded as such in the Company's financial statements for the year ended December 31, 2005.

## REASONS THE STATEMENTS WERE IMPROPER

116.    The statements referenced herein were each materially false and misleading when made because they failed to disclose and/or misrepresented the following adverse facts, among others:

(a)    that MBIA was materially overstating its financial results by engaging in improper accounting practices. As detailed herein, the Individual Defendants have caused MBIA to admit that its prior financial reports are materially false and misleading and has restated its results for 1998 and subsequent years. The Individual Defendants have caused or allowed the Company to admit that it was improperly accounting for two reinsurance agreements and has been subpoenaed by

46

the SEC, the New York Attorney General's Office and U.S. Attorney's Office for the Southern District of New York concerning documents relating to the accounting treatment of advisory fees, its methodology for determining loss reserves and case reserves, and instances of purchase of credit default protection on itself, among other things;

(b)    that the Company lacked adequate internal controls and was therefore unable to ascertain its true financial condition; and

(c)    that as a result of the foregoing, the values of the Company's earnings and net income were materially overstated at all relevant times.

## IMPROPER FINANCIAL REPORTING DURING THE RELEVANT PERIOD

117.    In order to inflate the price of MBIA's stock during the Relevant Period, the Individual Defendants caused or allowed MBIA to falsely report its results during FY:98, FY:99, FY:00, FY:01, FY:02, FY:03 and FY:04, through improper accounting practices, including improperly accounting for reinsurance agreements.

118.    The Company's FY:02, FY:03, FY:04 and part of FY:05, were included on Form 10-Qs and Form 10-Ks filed with the SEC. Defendants Budnick and Hamilton signed the Q1:02, Q2:02, Q3:02, Q1:03, Q2:03, Q3:03, and Q1:04 Form 10-Qs. Defendants Ferreri and Hamilton signed the Q2:04, Q3:04, Q1:05, and Q2:05 Form 10-Qs. Defendants Brown, Budnick, Hamilton, Clapp, Chaplin, Dunton, Gaudiani, Johnson, Kearney, Lebenthal, and Rolls signed the FY:02 and FY:03 Form 10-K. Defendants Brown, Hamilton, Chaplin, Clapp, Dunton, Gaudiani, Kearney, Meyer, Perry and Rolls signed the FY:04 Form 10-K. Defendants Brown, Ferreri, Hamilton, Chaplin, Clapp, Dunton, Gaudiani, Meyer, Kearney, Perry, Rolls and Yabuki signed the FY:05 Form 10-K.

119.    MBIA reported the following results for 1998 – 2003:

| In thousands except per share amounts | Previously Reported | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | 2003 | 2002 | 2001 | 2000 | 1999 | 1998 |
| **Consolidated Statement of Income Data:** | | | | | | |
| Net premiums written | $ 1,033,072 | $ 753,405 | $ 629,864 | $ 498,092 | $ 453,615 | $ 520,986 |
| Increase in deferred premiums revenue | (300,075) | (164,896) | (105,994) | (51,739) | (10,819) | (96,436) |
| Premiums earned | 732,997 | 588,509 | 523,870 | 446,353 | 442,796 | 424,550 |

| | | | | | | |
|---|---|---|---|---|---|---|
| Insurance revenues | 1,378,619 | 1,006,982 | 974,641 | 893,550 | 853,778 | 812,444 |
| Loss and loss adjustment expenses | 72,888 | 61,688 | 56,651 | 51,291 | 198,454 | 34,683 |
| Operating expenses | 108,130 | 87,401 | 80,498 | 83,066 | 80,082 | 70.330 |
| Insurance income | 1,139,694 | 810,224 | 795,059 | 723,217 | 538,542 | 672,818 |
| Income from continuing operations before income taxes | 1,145,296 | 779,739 | 765,116 | 689,173 | 371,684 | 553,857 |
| Provision for income taxes | 333,815 | 200,950 | 197,941 | 173,775 | 60,380 | 127,504 |
| Income from continuing operations | 811,481 | 578,789 | 567,175 | 515,398 | 311,304 | 426,353 |
| Net income | $ 813,585 | $ 579,087 | $ 570,091 | $ 528,637 | $ 320,530 | $ 432,728 |
| **Diluted EPS:** | | | | | | |
| Income from continuing operations | $ 5.60 | $ 3.92 | $ 3.80 | $ 3.47 | $ 2.07 | $ 2.84 |
| Net income | $ 5.61 | $ 3.92 | $ 3.82 | $ 3.56 | $ 2.13 | $ 2.88 |
| **Consolidated Balance Sheet Data:** | | | | | | |
| Prepaid reinsurance premiums | $ 535,728 | $ 521,641 | $ 507,079 | $ 442,622 | $ 403,210 | 352,699 |
| local assets | 30,393,219 | 18,894,334 | 16,257,005 | 13,894,338 | 12,263,899 | 11,826,202 |
| Loss and loss adjustment expense reserves | 684,995 | 615,508 | 575,709 | 499,279 | 467,279 | 299,752 |
| Current income taxes | 14,554 | 17,648 | 22,419 | 0 | 0 | 0 |
| Deferred income taxes, net | 552,740 | 471,534 | | 252,463 | 32,805 | 343,896 |
| Other liabilities | 422,257 | 345,031 | 306,891 | | | 253,159 |
| Total liabilities | 24,134,204 | 13,400,983 | 11,474,367 | | | 8,033,985 |
| Retained earnings | 4,593,486 | 3,895,112 | 3,415,517 | | | 2,246,221 |
| Shareholders' equity | $ 6,259,015 | $ 5,493,351 | $ 4,782,638 | $ 4,223,413 | $ 3,513,101 | $ 3,792,217 |

Restated

| In thousands except per share amounts | 2004 | 2003 | 2002 | 2001 | 2000 | 1999 | 1998 |
|---|---|---|---|---|---|---|---|
| **Consolidated Statement of Income Data:** | | | | | | | |
| Ceded premiums | $ (128,363) | $ (193,889) | $ (149,976) | $ (188,431) | $ (153,421) | $ (107,883) | (117,846) |
| Net premiums written | 988,552 | 1,074,919 | 801,955 | 676,795 | 533,987 | 516,988 | 559,204 |
| Increase in deferred premiums revenue | (138,882) | (301,925) | (183,475) | (129,921) | (69,202) | (59,857) | (130,536) |
| Premiums earned | 849,670 | 772,994 | 618,480 | 546,874 | 464,785 | 457,131 | 428,668 |
| Realized gains (losses) | 108,874 | 48,157 | 9,086 | 1,156 | 24,928 | 24,040 | 29,962 |
| Net gains (losses) on derivative instruments and foreign exchange - insurance | 6,627 | 104,030 | (76,627) | (2,476) | 0 | 0 | 0 |
| Total insurance revenues | 1,481,125 | 1,422,596 | 1,034,635 | 997,604 | 911,982 | 868,113 | 816,562 |
| Loss and loss adjustment expenses | 84,753 | 77,114 | 65,049 | 60,668 | 54,306 | 205,870 | 209,854 |
| Amortization of deferred acquisition costs | 66,412 | 60,491 | 49,696 | 43,986 | 37,235 | 37,783 | 34,657 |
| Operating expenses | 122,309 | 118,584 | 101,765 | 98,421 | 102,900 | 101,576 | 76,764 |
| Total insurance expenses | 273,474 | 256,189 | 216,510 | 203,075 | 194,441 | 345,229 | 321,275 |
| Insurance income | 1,207,651 | 1,166,407 | 818,125 | 794,529 | 717,541 | 522,884 | 495,287 |
| Net gains (losses) on derivative instruments and foreign exchange - IMS | (9,670) | (8,995) | (6,602) | (1,861) | 0 | 0 | 0 |
| Investment management services income | 47,609 | 54,901 | 34,314 | 38,437 | 31,559 | 25,601 | 32,018 |
| Income from continuing operations before income taxes | 1,172,593 | 1,163,399 | 788,606 | 765,088 | 683,497 | 356,026 | 376,326 |
| Provision for income taxes | 332,123 | 340,151 | 204,054 | 198,492 | 171,789 | 54,900 | 65,368 |
| Income from continuing operations | 840,470 | 823,248 | 584,552 | 566,596 | 511,708 | 301,126 | 310,958 |
| Net income | $ 843,046 | $ 825,352 | $ 584,850 | $ 569,512 | $ 524,947 | $ 310,352 | 317,333 |
| **Basic EPS:** | | | | | | | |
| Income from continuing operations | $ 5.92 | $ 5.74 | $ 3.99 | $ 3.82 | $ 3.46 | $ 2.02 | 2.09 |
| Net income | $ 5.94 | $ 5.75 | $ 3.99 | $ 3.84 | $ 3.55 | $ 2.08 | 2.14 |
| **Diluted EPS:** | | | | | | | |
| Income from continuing operations | $ 5.80 | $ 5.68 | $ 3.96 | $ 3.80 | $ 3.44 | $ 2.00 | 2.07 |
| Net income | $ 5.82 | $ 5.69 | $ 3.96 | $ 3.81 | $ 3.53 | $ 2.06 | 2.11 |
| **Consolidated Balance Sheet Data:** | | | | | | | |
| Deferred acquisition costs | $ 406,035 | $ 373,032 | $ 350,096 | $ 317,321 | $ 305,767 | $ 278,417 | 241,352 |
| Prepaid reinsurance premiums | 434,968 | 390,771 | 378,534 | 382,551 | 342,021 | 320,072 | 318,599 |
| Reinsurance recoverable on unpaid losses | 34,610 | 61,402 | 43,815 | 35,204 | 31,414 | 30,819 | 29,638 |

| | | | | | | |
|---|---|---|---|---|---|---|
| Derivative assets | 288,564 | 255,937 | 188,665 | 92,324 | 0 | 0 | 0 |
| Other assets | 314,321 | 250,299 | 159,403 | 146,816 | 105,213 | 165,417 | 196,289 |
| Total assets | 33,036,295 | 30,300,759 | 18,796,011 | 16,172,051 | 13,829,582 | 12,242,067 | 11,803,992 |
| Loss and loss adjustment expense reserves | 748,869 | 711,831 | 638,233 | 595,264 | 514,880 | 479,866 | 304,923 |
| Investment agreements | 8,678,768 | 6,959,153 | 6,388,232 | 6,055,118 | 4,789,455 | 4,512,832 | 3,485,057 |
| Deferred income taxes, net | 599,627 | 499,124 | 410,384 | 208,274 | 187,293 | 0 | 282,383 |
| Derivative liabilities | 527,455 | 435,254 | 309,018 | 110,426 | 0 | 0 | 0 |
| Other liabilities | 408,820 | 470,195 | 416,555 | 401,784 | 376,664 | 365,176 | 402,686 |
| Total liabilities | 26,477,498 | 24,150,467 | 13,426,668 | 11,519,020 | 9,735,432 | 8,854,539 | 8,127,170 |
| Retained earnings | 5,187,484 | 4,481,174 | 3,771,034 | 3,285,675 | 2,805,345 | 2,360,905 | 2,130,826 |
| Accumulated other comprehensive income | 618,606 | 636,212 | 541,320 | 145,556 | 85,707 | (224,511) | 288,915 |
| Total shareholders' equity | $ 6,558,797 | $ 6,150,292 | $ 5,369,343 | $ 4,653,031 | $ 4,094,150 | $ 3,387,528 | $ 3,676,822 |

120.    MBIA's results and representations concerning the results were false and misleading when made, as MBIA's financial statements for at least FY:98-FY:03 were not a fair presentation of MBIA's results and were presented in violation of Generally Accepted Accounting Principles ("GAAP") and SEC rules.

121.    Ultimately, MBIA announced the restatement of its earnings for FY:98 through FY:03 in which seven years of earnings were corrected to record Converium's $70 million payment in 1998 as a deposit, rather than insurance proceeds. The restatement reduced net income from 1998 through 2002 by $60 million and raised 2003 and 2004 profit by $6 million.

122.    In fact, MBIA's failure to record losses from the value of residual interests retained caused its financial statements to be false and misleading in violation of GAAP.

123.    GAAP are those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practice at a particular time. SEC Regulation S-X (17 C.F.R. §210.4-01(a)(1)) states that financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate, despite footnote or other disclosure. Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosure which would be duplicative of disclosures accompanying annual financial statements. (17 C.F.R. §210.10-01(a)).

124.    During the Relevant Period, MBIA failed to properly account for finite re-insurance charges causing its results to be materially overstated.

49

125.    Ultimately, MBIA announced the restatement of its financial results due to the improper accounting treatment for two reinsurance agreements that MBIA entered into in 1998 with Converium Re.

126.    The fact that MBIA restated its financial statements is an admission that the financial statements originally issued were false and that the overstatement of income was material. Pursuant to GAAP, as set forth in Accounting Principles Board Opinion ("APB") No. 20, the type of restatement announced by MBIA is to correct for material errors in its previously issued financial statements. *See* APB No. 20, ¶¶7-13. The restatement of past financial statements is a disfavored method of recognizing an accounting change as it dilutes confidence by investors in the financial statements, it makes it difficult to compare financial statements and it is often difficult, if not impossible, to generate the numbers when restatement occurs. *See* APB No. 20, ¶14. Thus, GAAP provides that financial statements should only be restated in limited circumstances, *i.e.*, when there is a change in the reporting entity, there is a change in accounting principles used or to correct an error in previously issued financial statements. Thus, the restatement is an admission by MBIA that its previously issued financial results and its public statements regarding those results were materially false.

127.    Due to these accounting improprieties, the Company presented its financial results and statements in a manner which violated GAAP, including the following fundamental accounting principles:

(a)     The principle that interim financial reporting should be based upon the same accounting principles and practices used to prepare annual financial statements was violated (APB No. 28, ¶10);

(b)     The principle that financial reporting should provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit and similar decisions was violated (FASB Statement of Concepts No. 1, ¶34);

(c)     The principle that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and effects of transactions, events

50

and circumstances that change resources and claims to those resources was violated (FASB Statement of Concepts No. 1, ¶40);

        (d)     The principle that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it was violated. To the extent that management offers securities of the enterprise to the public, it voluntarily accepts wider responsibilities for accountability to prospective investors and to the public in general (FASB Statement of Concepts No. 1, ¶50);

        (e)     The principle that financial reporting should provide information about an enterprise's financial performance during a period was violated. Investors and creditors often use information about the past to help in assessing the prospects of an enterprise. Thus, although investment and credit decisions reflect investors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance (FASB Statement of Concepts No. 1, ¶42);

        (f)     The principle that financial reporting should be reliable in that it represents what it purports to represent was violated. That information should be reliable as well as relevant is a notion that is central to accounting (FASB Statement of Concepts No. 2, ¶¶58-59);

        (g)     The principle of completeness, which means that nothing is left out of the information that may be necessary to insure that it validly represents underlying events and conditions was violated (FASB Statement of Concepts No. 2, ¶79); and

        (h)     The principle that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered was violated. The best way to avoid injury to investors is to try to ensure that what is reported represents what it purports to represent (FASB Statement of Concepts No. 2, ¶¶95, 97).

      128.    Further, the undisclosed adverse information concealed by defendants during the Relevant Period is the type of information which, because of SEC regulations, regulations of the national stock exchanges and customary business practice, is expected by investors and securities

analysts to be disclosed and is known by corporate officials and their legal and financial advisors to be the type of information which is expected to be and must be disclosed.

129.    At the same time that the defendants were causing MBIA to suffer such devastation of its market capitalization, the Insider Selling Defendants fared much better by selling over $32 million of their personally held stock.

## ILLEGAL INSIDER SELLING

130.    While in possession of the undisclosed material adverse information, the Insider Selling Defendants sold the following shares of MBIA stock:

| Name | Date | Shares | Price | Proceeds |
|------|------|--------|-------|----------|
| David H. Elliott | 2/27/2002 | 60000 | $58.11 | $3,486,600.00 |
|  | 5/31/2001 | 51000 | $52.90 | $2,697,900.00 |
|  | 9/28/2000 | 45000 | $71.01 | $3,195,450.00 |
|  | 11/23/1998 | 34748 | $66.91 | $2,324,988.68 |
|  | 11/23/1998 | 32000 | $66.91 | $2,141,120.00 |
|  |  | 222748 |  | $13,846,058.68 |
|  |  |  |  |  |
| Richard L. Weill | 3/1/2004 | 4800 | $65.75 | $315,600.00 |
|  | 2/2/2004 | 4800 | $63.59 | $305,232.00 |
|  | 2/2/2004 | 4800 | $59.18 | $284,064.00 |
|  | 12/1/2003 | 4800 | $58.00 | $278,400.00 |
|  | 11/3/2003 | 48000 | $58.80 | $2,822,400.00 |
|  | 10/1/2003 | 4200 | $54.97 | $230,874.00 |
|  | 10/1/2003 | 600 | $54.97 | $32,982.00 |
|  | 9/2/2003 | 4800 | $56.21 | $269,808.00 |
|  | 8/14/2003 | 21000 | $53.75 | $1,128,750.00 |
|  | 8/14/2003 | 41400 | $53.75 | $2,225,250.00 |
|  | 7/1/2002 | 3600 | $55.92 | $201,312.00 |
|  | 7/1/2002 | 1200 | $55.92 | $67,104.00 |
|  | 6/3/2002 | 4800 | $55.80 | $267,840.00 |
|  | 5/1/2002 | 4800 | $53.85 | $258,480.00 |
|  | 4/1/2002 | 4800 | $54.44 | $261,312.00 |
|  | 3/1/2002 | 4800 | $58.35 | $280,080.00 |
|  | 2/1/2002 | 4800 | $54.00 | $259,200.00 |
|  | 1/2/2002 | 4800 | $53.76 | $258,048.00 |
|  | 12/3/2001 | 2250 | $50.35 | $113,287.50 |
|  | 11/20/2001 | 2250 | $49.67 | $111,757.50 |
|  | 10/1/2001 | 2250 | $49.75 | $111,937.50 |
|  | 9/4/2001 | 2250 | $53.76 | $120,960.00 |
|  | 8/1/2001 | 2250 | $55.80 | $125,550.00 |
|  | 7/2/2001 | 2250 | $55.25 | $124,312.50 |

| | | | | |
|---|---|---|---|---|
| | 5/8/2001 | 2250 | $49.75 | $111,937.50 |
| | 4/2/2001 | 1500 | $80.43 | $120,645.00 |
| | 3/1/2001 | 1500 | $75.70 | $113,550.00 |
| | 2/12/2001 | 3000 | $74.50 | $223,500.00 |
| | 12/5/2000 | 10000 | $70.75 | $707,500.00 |
| | 12/18/2000 | 10000 | $74.38 | $743,800.00 |
| | 11/14/2000 | 10000 | $69.88 | $698,800.00 |
| | 8/7/2000 | 4000 | $62.50 | $250,000.00 |
| | 8/7/2000 | 10000 | $62.00 | $620,000.00 |
| | 8/7/2000 | 1000 | $63.75 | $63,750.00 |
| | 8/7/2000 | 1000 | $63.25 | $63,250.00 |
| | 8/7/2000 | 4000 | $63.00 | $252,000.00 |
| | 3/17/2000 | 3000 | $49.00 | $147,000.00 |
| | 3/17/2000 | 100 | $48.38 | $4,838.00 |
| | 3/17/2000 | 500 | $48.50 | $24,250.00 |
| | 3/17/2000 | 400 | $48.44 | $19,376.00 |
| | 2/8/2000 | 1000 | $41.00 | $41,000.00 |
| | 2/8/2000 | 500 | $41.06 | $20,530.00 |
| | 2/8/2000 | 500 | $41.13 | $20,565.00 |
| | 2/8/2000 | 1000 | $40.81 | $40,810.00 |
| | | **251550** | | **$14,741,642.50** |
| | | | | |
| Neil G. Budnick | 9/11/2002 | 1500 | $ 16.67 | $25,005.00 |
| | 8/5/2002 | 900 | $ 46.75 | $42,075.00 |
| | 8/5/2002 | 600 | $ 46.75 | $28,050.00 |
| | 7/3/2002 | 1500 | $ 53.98 | $80,970.00 |
| | 6/3/2002 | 1500 | $ 55.80 | $83,700.00 |
| | 5/3/2002 | 1500 | $ 54.60 | $81,900.00 |
| | 4/3/2002 | 1500 | $ 52.91 | $79,365.00 |
| | 3/11/2002 | 1100 | $ 56.74 | $62,414.00 |
| | 3/11/2002 | 400 | $ 56.78 | $22,712.00 |
| | 1/3/2002 | 1500 | $ 53.80 | $80,700.00 |
| | 12/3/2001 | 1500 | $ 50.35 | $75,525.00 |
| | 11/5/2001 | 1500 | $ 46.67 | $70,005.00 |
| | 10/3/2001 | 1500 | $ 48.88 | $73,320.00 |
| | 9/4/2001 | 1500 | $ 53.76 | $80,640.00 |
| | 8/3/2001 | 1500 | $ 55.11 | $82,665.00 |
| | 7/3/2001 | 1500 | $ 55.72 | $83,580.00 |
| | 5/3/2001 | 1500 | $ 47.67 | $71,505.00 |
| | 4/3/2001 | 1000 | $ 81.46 | $81,460.00 |
| | 3/5/2001 | 1000 | $ 76.70 | $76,700.00 |
| | 2/5/2001 | 1000 | $ 71.00 | $71,000.00 |
| | 1/3/2001 | 1000 | $ 70.00 | $70,000.00 |
| | | **26500** | | **$1,423,291.00** |
| | | | | |
| Julliette S. Tehrani | 1/12/1999 | 16000 | $69.97 | $1,119,520.00 |
| | 11/5/1998 | 8000 | $67.13 | $537,040.00 |
| | 11/5/1998 | 4983 | $67.56 | $336,651.48 |
| | 11/5/1998 | 4000 | $67.44 | $269,760.00 |
| | 11/5/1998 | 3500 | $67.31 | $235,585.00 |

| | 11/5/1998 | 4200 | $67.13 | $281,946.00 |
| | | 40683 | | $2,780,502.48 |
| **TOTAL** | | **541481** | | **$32,791,494.66** |

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

131.    Plaintiff brings this action derivatively in the right and for the benefit of MBIA to redress injuries suffered, and to be suffered, by MBIA as a direct result of the breaches of fiduciary duty, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment, as well as the aiding and abetting thereof, by the Individual Defendants. MBIA is named as a nominal defendant solely in a derivative capacity. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

132.    Plaintiff will adequately and fairly represent the interests of MBIA in enforcing and prosecuting its rights.

133.    Plaintiff is and was an owner of the stock of MBIA during times relevant to the Individual Defendants' wrongful course of conduct alleged herein, and remains a shareholder of the Company.

134.    On September 27, 2005, plaintiff made a demand on the Board of MBIA before commencing this action. A copy of plaintiff's demand is attached hereto as Exhibit A.

135.    As of the filing of this Complaint, the Board has not commenced an action as demanded.

136.    Plaintiff has not made any demand on shareholders of MBIA to institute this action since such demand would be a futile and useless act for the following reasons:

(a)    MBIA is a publicly held company with over 134 million shares outstanding, and thousands of shareholders;

(b)    Making demand on such a number of shareholders would be impossible for plaintiff who has no way of finding out the names, addresses or phone numbers of shareholders; and

(c)    Making demand on all shareholders would force plaintiff to incur huge expenses, assuming all shareholders could be individually identified

54

## COUNT I

### Against the Insider Selling Defendants for Breach of Fiduciary Duties for Insider Selling and Misappropriation of Information

137.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

138.    At the time of the stock sales set forth herein, the Insider Selling Defendants knew the information described above, and sold MBIA common stock on the basis of such information.

139.    The information described above was proprietary non-public information concerning the Company's financial condition and future business prospects. It was a proprietary asset belonging to the Company, which the Insider Selling Defendants used for their own benefit when they sold MBIA common stock.

140.    At the time of their stock sales, the Insider Selling Defendants knew that the Company's revenues were materially overstated. The Insider Selling Defendants' sales of MBIA common stock while in possession and control of this material adverse non-public information was a breach of their fiduciary duties of loyalty and good faith.

141.    Since the use of the Company's proprietary information for their own gain constitutes a breach of the Insider Selling Defendants' fiduciary duties, the Company is entitled to the imposition of a constructive trust on any profits the Insider Selling Defendants obtained thereby.

## COUNT II

### Against All Defendants for Breach of Fiduciary Duty

142.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

143.    The Individual Defendants owed and owe MBIA fiduciary obligations. By reason of their fiduciary relationships, the Officer Defendants and Director Defendants owed and owe MBIA the highest obligation of good faith, fair dealing, loyalty and due care.

144.    The Individual Defendants, and each of them, violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision.

55

145.    Each of the Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly misrepresent the financial results of the Company and failed to correct the Company's publicly reported financial results and guidance.  These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

146.    As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, MBIA has sustained significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

147.    Plaintiff on behalf of MBIA has no adequate remedy at law.

### COUNT III

### Against All Defendants for Abuse of Control

148.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

149.    The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence MBIA, for which they are legally responsible.

150.    As a direct and proximate result of the Individual Defendants' abuse of control, MBIA has sustained significant damages.

151.    As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

152.    Plaintiff on behalf of MBIA has no adequate remedy at law.

### COUNT IV

### Against All Defendants for Gross Mismanagement

153.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

154.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard

56

to prudently managing the assets and business of MBIA in a manner consistent with the operations of a publicly held corporation.

155.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, MBIA has sustained significant damages in excess of hundreds of millions of dollars.

156.    As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

157.    Plaintiff on behalf of MBIA has no adequate remedy at law.

## COUNT V

### Against All Defendants for Waste of Corporate Assets

158.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

159.    As a result of the improper accounting, and by failing to properly consider the interests of the Company and its public shareholders by failing to conduct proper supervision, defendants have caused MBIA to waste valuable corporate assets by paying incentive based bonuses to certain of its executive officers and incur potentially millions/billions of dollars of legal liability and/or legal costs to defend defendants' unlawful actions.

160.    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

161.    Plaintiff on behalf of MBIA has no adequate remedy at law.

## COUNT VI

### Against All Defendants for Unjust Enrichment

162.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

163.    By their wrongful acts and omissions, defendants were unjustly enriched at the expense of and to the detriment of MBIA.

164.    Plaintiff, as a shareholder and representative of MBIA, seeks restitution from these defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

## COUNT VII

### Against Defendants Brown, Budnick, Dunton and Ferreri for Disgorgement Under the Sarbanes-Oxley Act of 2002

165.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

166.    Pursuant to the Sarbanes-Oxley Act of 2002 §304, because MBIA has announced that it will restate its financial statements for fiscal years 2002 through 2004 due to material noncompliance with SEC rules and published guidance as a result of false and misleading financial statements, defendants Brown and Dunton as Chairmen and CEOs and defendants Ferreri and Budnick as CFOs are required to reimburse MBIA for all bonuses or other incentive-based or equity-based compensation, received by them from MBIA during 2002 through 2004.

167.    Defendants Budnick, Brown, Dunton and Ferreri are also liable to plaintiff for reasonable costs and attorneys' fees in the prosecution of this derivative action on behalf of MBIA.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff demands judgment as follows:

A.    Against all of the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment;

B.    Declaring that defendants Brown, Dunton, Budnick and Ferreri are liable under the Sarbanes-Oxley Act of 2002 and requiring them to reimburse MBIA for all bonuses or their incentive-based or equity-based compensation received by them during 2002 through 2004.

C.    Directing MBIA to take all necessary actions to reform and improve their corporate governance and internal procedures to comply with applicable laws and to protect MBIA and its

58

shareholders from a repeat of the damaging events that occurred during the Relevant Period, including, but not limited to, putting forward for shareholder vote resolutions for amendments to the companies' By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote the following Corporate Governance Policies:

      1.     a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

      2.     a provision to permit the shareholders of MBIA to nominate at least three candidates for election to the Board;

      3.     appropriately test and then strengthen the internal audit and control functions; and

      4.     control and limit insider stock selling;

     D.     Extraordinary equitable and/or injunctive relief as permitted by law, equity and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on or otherwise restricting the proceeds of defendants' trading activities or their other assets so as to assure that plaintiff on behalf of MBIA has an effective remedy;

     E.     Awarding to MBIA restitution from the defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by the defendants;

     F.     Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

     G.     Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED: April 24, 2006

THE LAW OFFICES OF THOMAS G. AMON

_____
THOMAS G. AMON

500 Fifth Avenue, Suite 1650
New York, N.Y. 10110
Telephone: 212/810-2430

59

Facsimile: 212/810-2427

ROBBINS UMEDA & FINK, LLP
BRIAN J. ROBBINS
MARC M. UMEDA
610 West Ash Street, Suite 1800
San Diego, CA 92101
Telephone: 619/525-3990
Facsimile: 619/525-3991

Attorneys for Plaintiff

G:\Cases\MBIA\Complaints\Orton Der Cpt FINAL.doc

## VERIFICATION

I, J. ROBERT ORTON, JR., have read the MBIA, Inc. Verified Shareholder Derivative Complaint and know the contents thereof. The Complaint is true and correct to the best of my knowledge, information and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Signed and Accepted:

Dated: 4-19-06

J. ROBERT ORTON, JR.